**OIL, CHEMICAL AND ATOMIC WORKERS INTERNATIONAL UNION, and Local 3–499, Oil, Chemical and Atomic Workers, Petitioners,**

v.

**AMERICAN CYANAMID COMPANY, Respondent.**

No. 81–1687.

United States Court of Appeals, District of Columbia Circuit.

Argued Oct. 4, 1983.

Decided Aug. 24, 1984.

George H. Cohen, Washington, D.C., with whom Robert M. Weinberg and Jeremiah A. Collins, Washington, D.C., were on the brief, for petitioners.

Donald L. Morgan, Washington, D.C., with whom Charles F. Lettow and Mark N. Duvall, Washington, D.C., were on the brief, for respondent. John D. McInerney also entered an appearance for respondent.

Elizabeth M. Schneider, Newark, N.J., was on the brief for amicus curiae, Coali-

---

tion for the Reproductive Rights of Workers urging reversal.

Daniel J. Popeo, Paul D. Kamenar and Nicholas E. Calio, Washington, D.C., were on the brief for amicus curiae, Washington Legal Foundation urging affirmance.

Allen H. Feldman and Dennis K. Kade, Washington, D.C., Attys., Dept. of Labor, entered appearances for the Secretary of Labor.

Before BORK and SCALIA, Circuit Judges, and WILLIAMS,* Senior District Judge for the Central District of California.

BORK, Circuit Judge:

Petitioners Oil, Chemical and Atomic Workers International Union and Local 3–499, Oil, Chemical and Atomic Workers (together, "OCAW") seek reversal of an order by the Occupational Safety and Health Review Commission. The Commission held that respondent American Cyanamid Company's fetus protection policy "is not a hazard cognizable under the Occupational Safety and Health Act." That policy, adopted at the company's Willow Island, West Virginia plant, provided that women employees of childbearing age could not hold jobs that exposed them to toxic substances at levels considered unsafe for fetuses. An exception was made for women who could show that they had been surgically sterilized. The Secretary of Labor issued a citation alleging that Cyanamid's policy violated the general duty clause of the Occupational Safety and Health Act of 1970, 29 U.S.C. § 654(a)(1) (1982). The Administrative Law Judge vacated the citation, and the Commission affirmed on the ground that the policy in question was not cognizable under the Act. OCAW, an intervenor in the proceedings before the Commission, brought this petition for review. The Secretary has not challenged the Commission's decision.

For reasons discussed below, we think the language of the Act cannot be stretched so far as to hold that the sterilization option of the fetus protection policy is a "hazard" of "employment" under the general duty clause. Consequently, we affirm.

I.

It is important to understand the context in which this case arose and the task that is set for this court. American Cyanamid found, and the administrative law judge agreed, that it could not reduce ambient lead levels in one of its departments sufficiently to eliminate the risk of serious harm to fetuses carried by women employees. The company was thus confronted with unattractive alternatives: It could remove all women of childbearing age from that department, a decision that would have entailed discharging some of them and giving others reduced pay at other jobs, or the company could attempt to mitigate the severity of this outcome by offering continued employment in the department to women who were surgically sterilized. The company chose the latter alternative, and the women involved were thus faced with a distressing choice. Some chose sterilization, some did not.

As we understand the law, we are not free to make a legislative judgment. We may not, on the one hand, decide that the company is innocent because it chose to let the women decide for themselves which course was less harmful to them. Nor may we decide that the company is guilty because it offered an option of sterilization that the women might ultimately regret choosing. These are moral issues of no small complexity, but they are not for us. Congress has enacted a statute and our only task is the mundane one of interpreting its language and applying its policy.

In January and February of 1978, Glen Mercer, the plant Director of Industrial Relations, conducted a series of meetings for small groups of the Willow Island plant's female employees. At these meet-

* Sitting by designation pursuant to 28 U.S.C. § 294(d).

ings Mercer informed the women that hundreds of chemicals used at the plant were harmful to fetuses and that, consequently, the company had decided to exclude women of "childbearing capacity" from all departments of the plant where such chemicals were used. Mercer further declared that the company would deem any woman between the ages of 16 and 50 to be of childbearing capacity unless she presented proof that she had been surgically sterilized.

A company doctor and nurse accompanied Mercer to these meetings and addressed the women. They explained to the women that such "buttonhole surgery" was simple and that it could be obtained locally in several places. Rymer Statement, p. 2 (J.A. at 411); Moler Statement, p. 2 (J.A. at 407); Martin Statement, p. 2 (J.A. at 415). The women were also told that the company's medical insurance would pay for the procedure, and that sick leave would be provided to those undergoing the surgery. Cantwell Statement, p. 1 (J.A. at 421).

Mercer told the women that once the fetus protection policy was fully implemented the plant would have only about seven jobs for fertile women in the entire facility. Approximately thirty women were then employed at the Willow Island plant. Apart from the women who obtained those seven positions, Mercer said that female employees who failed to undergo surgical sterilization by May 1, 1978, would be terminated. The company extended the May 1, 1978, deadline several times. In September, 1978, the company informed the women of changes in its policy. The deadline had been extended to October 2, 1978, the Inorganic Pigments Department was the only department affected, and the only material covered by the policy was lead. It is undisputed that lead poses a severe danger to fetuses. OSHA's lead standard states the agency's belief that "the fetus is at risk from exposure to lead throughout the gestation period ..." and is "susceptible to neurological damage." 43 Fed.Reg. 54,422 (1978). OSHA concluded that "blood lead levels should be kept below 30 μg/100 g."

*Id.* That level is 30 micrograms of lead per 100 grams of whole blood. American Cyanamid was unable to reduce the lead hazard in its Inorganic Pigments Department to the level required to protect fetuses. The Administrative Law Judge ("ALJ") determined that it was economically infeasible to reduce ambient air lead levels to 200 micrograms ($\mu$g) of lead per cubic meter (m$^3$) of air at the Inorganic Pigments Department of the Willow Island plant. *See American Cyanamid Co.,* 1980 O.S.H. Dec. (CCH) ¶ 24,828 (Sept. 30, 1980). The preamble to the lead standard predicts that air lead levels of 200 $\mu$g/m$^3$ would lead to 83.8% of blood lead levels above 40 $\mu$g/100 grams (g) at any given time. An ambient air lead level of even 50 $\mu$g/m$^3$ would result in a predicted 20.3% of blood lead levels above 40 $\mu$g/100g at any one time. *See* 43 Fed.Reg. 52,963 (1978). In *United Steelworkers of America v. Marshall,* 647 F.2d 1189 (D.C.Cir.1980), *cert. denied,* 453 U.S. 913, 101 S.Ct. 3148, 69 L.Ed.2d 997 (1981), without reaching the question of economic feasibility, this court found that OSHA had failed to establish the technological feasibility of reducing ambient air lead levels to 50 $\mu$g/m$^3$ in the lead pigment manufacturing industry. 647 F.2d at 1295.

American Cyanamid apparently concluded, after considering these facts, that the only realistic and clearly lawful possibility left open to it was to remove women capable of bearing children from the Inorganic Pigments Department.

Between February and July, 1978, five women employed in the Inorganic Pigments Department underwent surgical sterilization at a hospital not connected with the company. Two female employees in that department did not choose sterilization. The company transferred them into other departments and, after ninety days, lowered their rate of pay to correspond to the rates characteristic of their new jobs.

From January 4 through April 13, 1979, OSHA conducted an inspection of the Willow Island plant. On October 9, 1979,

OSHA issued the citation that is the subject of this case. The citation alleged that American Cyanamid had violated section 5(a)(1) of the Act, 29 U.S.C. § 654(a)(1) (1982), the "general duty clause," as follows:

> The employer did not furnish employment and a place of employment which were free from recognized hazards that were causing or were likely to cause death or serious physical harm to employees, in that: The employer adopted and implemented a policy which required women employees to be sterilized in order to be eligible to work in the areas of the plant where they would be exposed to certain toxic substances:
>
> (a) Inorganic Pigment Department— Buildings No. 85 and No. 86.

J.A. at 1. Classifying the violation as willful, the citation declared that it should be abated immediately and proposed a penalty of $10,000. *Id.*

American Cyanamid notified the Secretary of its "intention to contest the citation[ ], abatement dates and/or proposed assessments or penalties . . . ." J.A. at 2. An ALJ was then assigned to the case for adjudication. OCAW participated as a party to the proceedings. On July 15, 1980, the ALJ granted the company's motion for summary judgment on two grounds, neither of which is the subject of this appeal. Reviewing the ALJ's decision pursuant to section 12(j) of the Act, 29 U.S.C. § 661(i) (1982), the Commission affirmed that decision on the ground that the citation failed to allege a violation cognizable under the Act. The Commission found as a matter of law that the hazard alleged by the Secretary was not the kind of hazard Congress contemplated in the Act. Thus, the Commission stated:

> [I]t is clear that Congress conceived of occupational hazards in terms of processes and materials which cause injury or disease by operating directly upon employees as they engage in work or work-related activities.
>
> The fetus protection policy is of a different character altogether. It is neither a work process nor a work material, and it manifestly cannot alter the physical integrity of employees while they are engaged in work or work-related activities. An employee's decision to undergo sterilization in order to gain or retain employment grows out of economic and social factors which operate primarily outside the workplace. The employer neither controls nor creates these factors as he creates or controls work processes and materials. For these reasons we conclude that the policy is not a hazard within the meaning of the general duty clause.

*American Cyanamid Co.,* 9 O.S.H. Cas.(BNA) 1596, 1600 (1981); J.A. at 508 (footnote omitted).

## II.

The Occupational Safety and Health Act of 1970 provides, in relevant part:

> The Congress declares it to be its purpose and policy . . . to assure so far as possible every working man and woman in the Nation safe and healthful working conditions . . . .

Section 2(b), 29 U.S.C. § 651(b) (1982). This statement of purpose and policy must be considered in construing other provisions of the Act. The general duty clause of the Occupational Safety and Health Act of 1970 provides:

> (a) Each employer—
>
> (1) shall furnish to each of his employees employment and a place of employment which are free from recognized hazards that are causing or are likely to cause death or serious physical harm to his employees.

29 U.S.C. § 654(a)(1).

There is no doubt that the words of the general duty clause can be read, albeit with some semantic distortion, to cover the sterilization exception contained in American Cyanamid's fetus protection policy. As OCAW points out, the rule bears upon "employment," and may be described as a "condition of employment." The policy may be characterized as a "hazard" to female employees who opted for sterilization in order

to remain in the Inorganic Pigments Department, though it requires some stretching to call the offering of a choice a "hazard" to the person who is given the choice. Sterilization can, of course, be a "serious physical harm." For these reasons, OCAW contends that the sterilization exception falls within the plain meaning of the statutory language. That conclusion is necessary, however, only if the words of the statute inescapably have the meaning petitioners find in them and are unaffected by precedent, usage, and congressional intent. The words of the statute—in particular, the terms "working conditions" and "hazards" —are not so plain that they foreclose all interpretation.

Indeed, these words have been interpreted by courts, and in a way that strongly suggests affirmance of the Commission. *Corning Glass Workers v. Brennan*, 417 U.S. 188, 94 S.Ct. 2223, 41 L.Ed.2d 1 (1974), though it involved the Equal Pay Act of 1963, spoke to the meaning of the phrase, "working conditions" and decided it should be given content by "the language of industrial relations." *Id.* at 202, 94 S.Ct. at 2232. The language of industrial relations, of course, is as relevant to the OSH Act as to the Equal Pay Act. In *Corning Glass Workers*, the Supreme Court stated:

> [T]he element of working conditions encompasses two subfactors: "surroundings" and "hazards." "Surroundings" measures the elements, such as toxic chemicals or fumes, regularly encountered by a worker, their intensity, and their frequency. *"Hazard" takes into account the physical hazards regularly encountered, their frequency, and the severity of injury they can cause.* This definition of "working conditions" is ... well accepted across a wide range of American industry.

*Id.* (emphasis added) (footnotes omitted). The narrowness of this definition is emphasized by the fact that, using it, the Court determined that the difference between a night shift and a day shift was not a "working condition."

■ This definition was applied by the Fourth Circuit to the OSH Act in *Southern Ry. v. OSHRC*, 539 F.2d 335, *cert. denied,* 429 U.S. 999, 97 S.Ct. 525, 50 L.Ed.2d 609 (1976):

> We think this aggregate of "surroundings" and "hazards" contemplates an area broader in its contours than ... "particular, discrete hazards" ... but something less than the employment relationship in its entirety .... *[W]e are of the opinion that the term "working conditions" as used in Section 4(b)(1) means the environmental area in which an employee customarily goes about his daily tasks.*

539 F.2d at 339 (emphasis added). Although a different section of the Act was involved in *Southern Ry.,* we can think of no reason why the definition given of "working conditions" should not apply to section 2(b) and hence influence the concept of "hazards" in the general duty clause. Congress may be presumed to have legislated about industrial relations with the "language of industrial relations" in mind. It follows, therefore, that the general duty clause does not apply to a policy as contrasted with a physical condition of the workplace.

We might rest the outcome of this case upon this case law, but petitioners advance an argument by analogy that should be discussed: "In this case, employees had in effect two choices: to undergo sterilization, or to quit. That such a 'choice' offends the Act can be seen from the fact that if, instead of a sterilization *policy,* the hazard at issue in this case had consisted of exposure to a sterilizing *chemical,* employees would have had the same choices: to undergo sterilization, or to quit.... [T]he Commission would not suggest that the presence of such factors would remove the sterilizing *chemical* from the ambit of the Act, and there is no logical basis for suggesting that the presence of such factors should remove the sterilization *policy* from the ambit of the Act." Brief for Petitioners at 33 (footnote omitted) (emphasis in original). To make the analogy complete, we should also suppose that in the hypo-

thetical case, the employer could not possibly remove enough of the chemical to eliminate its sterilizing effect. We have no desire to decide this hypothetical case, so we will assume for the sake of the argument that an employer could not, under the OSH Act, permit workers to choose continued employment and sterilization by the chemical. It remains true, nonetheless, that the "hazards" in the two cases are not identical unless it can be said that anything, no matter what its nature or how it operates, is a "hazard" within the meaning of the general duty clause if it has a harmful effect. A chemical is not the same thing as a policy and a congressional decision to deal with one does not necessarily constitute a decision to deal with the other.

■■■ This, essentially, was the reasoning of the Review Commission. The Commission pointed out that the Act does not define the term "hazard" and turned to the legislative history for guidance. "Congressional floor debates, committee reports, and individual and minority views ... are replete with discussions of air pollutants, industrial poisons, combustibles and explosives, noise, unsafe work practices and inadequate training and the like." J.A. at 507 (footnote omitted). From this, and other evidence of a similar nature, the Commission concluded that "Congress conceived of occupational hazards in terms of processes and materials which cause injury or disease by operating directly upon employees as they engage in work or work-related activities." *Id.* at 508 (footnote omitted). The fetus protection policy, by contrast, does not affect employees while they are engaged in work or work-related activities. The decision to be sterilized "grows out of economic and social factors which operate primarily outside the workplace," and hence the fetus protection policy "is not a hazard within the meaning of the general duty clause." *Id.* We agree with this conclusion. Were we to decide otherwise, we would have to adopt a broad principle of unforeseeable scope: any employer policy which, because of employee economic incentives, left open an option exercised outside the workplace that might be harmful would constitute a "hazard" that made the employer liable under the general duty clause. It might be possible to legislate limitations upon such a principle but that is a task for Congress rather than courts. As it now stands, the Act should not be read to make an employer liable for every employee reaction to the employer's policies. There must be some limit to the statute's reach and we think that limit surpassed by petitioners' contentions. The kind of "hazard" complained of here is not, as the Commission said, sufficiently comparable to the hazards Congress had in mind in passing this law.

We are not prepared to speculate that, although Congress was thinking only about tangible hazards such as chemicals, it would, had it considered the subject, have decided that any employer-offered choice which leads to injury rather than discharge is a violation of the Act. That conclusion would have required a great deal of thought about unforeseen liabilities for employers and how far to let employees decide what is in their own best interest. It is not possible to say that, in all circumstances imaginable, Congress would have made employers liable for giving employees an option where the only feasible alternative was discharge. It seems to us safer, therefore, to confine the term "hazards" under the general duty clause to the types of hazards we know Congress had in mind.

Petitioners' argument may reveal a degree of uneasiness about the implications of their position. It is clear that American Cyanamid had to prevent exposure to lead of women of childbearing age, and, furthermore, that the company could not have been charged under the Act if it had accomplished that by discharging the women or by simply closing the Department, thus putting all employees who worked there, including women of childbearing age, out of work. The company was charged only because it offered the women a choice. Perhaps uncomfortable with the position that it was the offering of a choice that made the company liable, counsel for OCAW stated at oral argument that there

would have been no violation if the company had simply stated that "only sterile women" would be employed in the Department because there would then have been no "requirement" of sterilization. We agree that such an announcement would not have involved a violation of the general duty clause, but we fail to see how that policy differs under the statute from the policy American Cyanamid adopted. An "only sterile women" announcement would also have given women of childbearing age the option of surgical sterilization. The only difference between this case and the hypothetical is that here the company pointed out the option and provided information about it. As petitioners frame the issue, therefore, violation of the general duty clause depends on the explicitness with which an employer phrases an option made available by its policy. It cannot be that the employer is better shielded from liability the less information it provides. It would, in any event, be difficult to find that distinction in the words of the general duty clause.

The case might be different if American Cyanamid had offered the choice of sterilization in an attempt to pass on to its employees the cost of maintaining a circu-

mambient lead concentration higher than that permitted by law. But that is not this case. The company could not reduce lead concentrations to a level that posed an acceptable risk to fetuses. The sterilization exception to the requirement of removal from the Inorganic Pigments Department was an attempt not to pass on costs of unlawful conduct but to permit the employees to mitigate costs to them imposed by unavoidable physiological facts.

The women involved in this matter were put to a most unhappy choice. But no statute redresses all grievances, and we must decide cases according to law. Reasoning from precedent, congressional intent, and the unforeseeable consequences of a contrary holding, we conclude that American Cyanamid's fetus protection policy did not constitute a "hazard" within the meaning of the OSH Act.[1]

*Affirmed.*

---

1. It has been suggested that what occurred here may be an "unfair labor practice" under the National Labor Relations Act or a forbidden sex discrimination under Title VII of the Civil Rights Act of 1964. In fact, we are informed by counsel for respondent that OCAW and the women involved in this situation filed suit under Title VII, and that American Cyanamid has settled that suit.