**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**February 18, 2009**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

## UNITED STATES COURT OF APPEALS

## TENTH CIRCUIT

---

RAMSEY WINCH INC.; AUTO
CRANE COMPANY;
CONOCOPHILLIPS; NORRIS, a
Dover Resources Company; DP
MANUFACTURING, INC., a
Delaware Corporation; TULSA
WINCH, INC., a Delaware
corporation,

      Plaintiffs-Appellees,

v.

C. BRAD HENRY, Governor of the
State of Oklahoma; W. A. DREW B.
EDMONSON, Attorney General of the
State of Oklahoma, and their Agents
and Successors,

      Defendants-Appellants,

---

NATIONAL RIFLE ASSOCIATION;
THE BRADY CENTER TO
PREVENT GUN VIOLENCE; THE
AMERICAN SOCIETY OF SAFETY
ENGINEERS; ASIS
INTERNATIONAL; SOCIETY OF
HUMAN RESOURCES
MANAGEMENT; HR POLICY
ASSOCIATION; EQUAL
EMPLOYMENT ADVISORY
COUNCIL; NATIONAL
FEDERATION OF INDEPENDENT
BUSINESS LEGAL FOUNDATION,

No. 07-5166

Amici Curiae.

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA
(D.C. No. 04-CV-820-TCK)
(520 F. Supp. 2d 1282)**

---

Steven A. Broussard (Mark K. Blongewicz, Robert P. Fitz-Patrick, and Marshall J. Wells, Hall, Estill, Hardwick, Gable, Golden & Nelson, Tulsa, Oklahoma; and W. Kirk Turner and Christopher S. Thrutchley, Newton, O'Connor, Turner & Ketchum, Tulsa, Oklahoma; with him on the briefs) Hall, Estill, Hardwick, Gable, Golden & Nelson, P.C., Tulsa, Oklahoma; for Plaintiffs-Appellees.

Charles J. Cooper (Sherry A. Todd, Oklahoma Attorney General's Office, Oklahoma City, Oklahoma, with him on the briefs) Cooper & Kirk, PLLC, Washington, D.C. for Defendants-Appellants.

_____

Before **KELLY**, **BALDOCK**, and **McCONNELL**, Circuit Judges.

---

**BALDOCK**, Circuit Judge.

---

A number of Oklahoma businesses forbid their employees from bringing firearms onto company property. In March 2004, the Oklahoma legislature amended its laws to narrow the reach of such company policies. These new laws hold employers criminally liable for prohibiting employees from storing firearms in locked vehicles on company property. Various Oklahoma businesses subsequently filed suit seeking to enjoin the enforcement of the new Oklahoma laws, alleging they were (1) unconstitutionally vague; (2) an unconstitutional taking of private property,

2

as well as a violation of Plaintiffs' due process right to exclude others from their property; and (3) preempted by various federal statutes. The district court for the Northern District of Oklahoma held that the challenged laws were preempted by the Occupational Health and Safety Act (OSH Act) of 1970 and permanently enjoined enforcement of the new laws. We have jurisdiction under 28 U.S.C. § 1291, and reverse.

## I.

Numerous Oklahoma businesses maintain a policy of absolute prohibition on employees' possession of firearms on company property, a violation of which may serve as grounds for termination. After several Oklahoma employees were, in fact, discharged for storing firearms in their vehicles on company parking lots, the Oklahoma legislature amended its firearms laws. Specifically, the legislature amended the Oklahoma Firearms Act (OFA) of 1971 and the Oklahoma Self-Defense Act (OSDA) of 1995 to prohibit property owners from banning the storage of firearms locked in vehicles located on the owner's property.[1] See 21 Okla. Stat. §§ 1289.7a & 1290.22.[2]

---

[1] The original amendment to the OFA was passed in 2004. A revised version, 21 Okla. Stat. § 1289.7a, was passed in 2005 which included protection from tort liability for property owners. The original 2004 amendment to the OSDA, 21 Okla. Stat. § 1290.22, remains in effect. Thus, before us on appeal are the 2005 OFA amendment and the 2004 OSDA amendment. Throughout this opinion, we collectively refer to these new laws as "the Amendments."

[2] 21 Okla. Stat. § 1289.7a provides:

(continued...)

3

[2](...continued)

TRANSPORTING OR STORING FIREARMS IN LOCKED MOTOR VEHICLE ON PRIVATE PREMISES–PROHIBITION PROSCRIBED–LIABILITY– ENFORCEMENT

A. No person, property owner, tenant, employer, or business entity shall maintain, establish, or enforce any policy or rule that has the effect of prohibiting any person, except a convicted felon, from transporting and storing firearms in a locked motor vehicle, or from transporting and storing firearms locked in or locked to a motor vehicle on any property set aside for any motor vehicle.

B. No person, property owner, tenant, employer, or business entity shall be liable in any civil action for occurrences which result from the storing of firearms in a locked motor vehicle on any property set aside for any motor vehicle, unless the person, property owner, tenant, employer, or owner of the business entity commits a criminal act involving the use of the firearms. The provisions of this subsection shall not apply to claims pursuant to the Workers' Compensation Act.

C. An individual may bring a civil action to enforce this section. If a plaintiff prevails in a civil action related to the personnel manual against a person, property owner, tenant, employer or business for a violation of this section, the court shall award actual damages, enjoin further violations of this section, and award court costs and attorney fees to the prevailing plaintiff.

D. As used in this section, "motor vehicle" means any automobile, truck, minivan, sports utility vehicle, motorcycle, motor scooter, and any other vehicle required to be registered under the Oklahoma Vehicle License and Registration Act.

(continued...)

Whirlpool Corporation filed the initial action in this case seeking an injunction against enforcement of the Amendments.[3]  In November 2004, the district court entered a temporary restraining order (TRO) against enforcement of the Amendments, finding they were likely preempted by various federal laws.  Before deciding whether to issue a permanent injunction, the district court certified to the Oklahoma Court of Criminal Appeals the question of whether the Amendments were criminal statutes.  At the time, the status of the Amendments was uncertain.  The district court was concerned that if the Amendments were civil in nature, the

_____

[2](...continued)
21 Okla. Stat. § 1290.22 provides:

> BUSINESS OWNER'S RIGHTS
> A.  Except as provided in subsection B of this section, nothing contained in any provision of the Oklahoma Self-Defense Act, Section 1290.1 et seq. of this title, shall be construed to limit, restrict or prohibit in any manner the existing rights of any person, property owner, tenant, employer, or business entity to control the possession of weapons on any property owned or controlled by the person or business entity.
> B.  No person, property owner, tenant, employer, or business entity shall be permitted to establish any policy or rule that has the effect of prohibiting any person, except a convicted felon, from transporting and storing firearms in a locked vehicle on any property set aside for any vehicle.

[3]  Whirlpool has since withdrawn from the litigation and numerous other companies have intervened as Plaintiffs. We collectively refer to the group of companies currently seeking a permanent injunction as "Plaintiffs."

Oklahoma Governor and Attorney General might not have enforcement authority over the Amendments, thereby making them improper parties to this action. The Court of Criminal Appeals alleviated the district court's concerns, ruling that the Amendments were, in fact, criminal statutes. See Whirlpool Corp. v. Henry, 110 P.3d 83, 86 (Okla. Crim. App. 2005).[4] Following this ruling, the district court moved forward with Plaintiffs' request for a permanent injunction and ordered extensive briefing by the parties on the issue of preemption, in particular whether the Amendments conflict with the OSH Act.[5]

In October 2007, the district court ruled the Amendments were not an unconstitutional taking and did not violate Plaintiffs' due process rights. The district court further ruled Plaintiffs lacked standing to assert a facial vagueness challenge.

---

[4] We agree with the district court, as do both parties, that the Governor and the Attorney General were properly named as Defendants. Oklahoma law grants enforcement authority of the Amendments to the Governor and Attorney General. See 74 Okla. Stat. § 18(b)(A)(1)-(3) (conferring authority to the Attorney General, subject to the direction of the Governor, to appear for the state in criminal appeals and in all cases of particular interest to the state). As such, a sufficient case or controversy exists between Plaintiffs and Defendants. See Wilson v. Stocker, 819 F.2d 943, 947 (10th Cir. 1987) ("[A] plaintiff challenging the constitutionality of a state statute has a sufficiently adverse legal interest to a state enforcement officer sued in his representative capacity to create a substantial controversy when . . . the plaintiff shows an appreciable threat of injury flowing directly from the statute."); see also Ex Parte Young, 209 U.S. 123, 157 (1908) (noting that a state officer can be named a party defendant if the officer "has some connection with the enforcement of the act").

[5] A thorough description of this case's procedural history is provided in the district court's opinion. See Conoco Phillips Co. v. Henry, 520 F. Supp. 2d 1282, 1286-95 (N.D. Okla. 2007).

Lastly, the district court held the Amendments were preempted by the OSH Act's general duty clause.[6] Accordingly, the district court permanently enjoined enforcement of the Amendments.[7]

## II.

Congress derives its power to preempt state law under the Supremacy Clause in Article VI of the United States Constitution. See Choate v. Champion Home Builders Co., 222 F.3d 788, 791 (10th Cir. 2000). Determining whether Congress *intended* to preempt state law is the ultimate touchstone of preemption analysis. See Gade v. Nat'l Solid Wastes Mgmt. Ass'n, 505 U.S. 88, 96 (1992). Three types of preemption exist. See Choate, 222 F.3d at 792. First, Congress can explicitly preempt state law, also known as "express preemption." Id. Second, courts infer preemption where Congress extensively regulates conduct in an entire field, or where the federal interest clearly dominates. See id. This is known as "field preemption." Id. Express and field preemption do not apply to the present case. The third category, known as "conflict preemption," occurs "where it is impossible for a

[6] The district court intimated that it believed the Amendments may conflict with the Brady Handgun Violence Prevention Act (Brady Act), 18 U.S.C. § 922. See Conoco Phillips, 520 F. Supp. 2d at 1302 n. 29, 1304. But the district court did not ultimately rule on the Brady Act's potential preemption and Plaintiffs do not raise the issue on appeal. Thus, we do not address the Brady Act here. See Tele-Commc'ns Inc. v. Comm'r, 104 F.3d 1229, 1233 (10th Cir. 1997) (noting that we generally do not resolve issues on appeal unless they are presented, considered, and decided by the district court).

[7] When the district court issued its permanent injunction, the TRO was still in effect pursuant to the parties' agreement.

7

private party to comply with both state and federal requirements, or where state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." Id. Conflict preemption requires that the state law materially impede or thwart the federal law or policy. See id. at 796.

The district court enjoined enforcement of the Amendments based upon conflict preemption, ruling that (1) gun-related workplace violence is a recognized hazard under the general duty clause; and (2) the Amendments impermissibly conflict with Plaintiffs' ability to comply with the general duty clause, thereby thwarting Congress' overall intent in passing the OSH Act. See Conoco Phillips, 520 F. Supp. 2d at 1330. In support of its ruling, the district court relied on various studies and scholarly works outlining the growing problem of workplace violence. The district court also cited published statements from the Occupational Safety and Health Administration (OSHA) and prior cases concerning the OSH Act's general duty clause. We review the district court's preemption determination de novo. See Mount Olivet Cemetery Ass'n. v. Salt Lake City, 164 F.3d 480, 486 (10th Cir. 1998).

A.

Courts do not "lightly attribute to Congress or to a federal agency the intent to preempt state or local laws." Nat'l Solid Wastes Mgmt. Ass'n v. Killian, 918 F.2d 671, 676 (7th Cir. 1990) In fact, we begin "with the assumption that the historic police powers of the States [are] not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." Altria Group, Inc. v. Good, 129

8

S.Ct. 538, 543 (2008) (quoting Rice v. Santa Fe Elevator Corp., 331 U.S. 218, 230 (1947)). This assumption applies with greater force when the alleged conflict is in an area traditionally occupied by the States. See id. Here, we are faced with "public crimes" meant "to protect the health, safety, and public welfare of citizens and to deter crime." Whirlpool, 110 P.3d at 86. The Amendments, therefore, implicate Oklahoma's police powers, an area traditionally controlled by the states. See, e.g., United States v. Lopez, 514 U.S. 549, 561 n. 3 (1995) (noting in its preemption review of the federal Gun-Free School Zones Act of 1990 that defining and enforcing criminal law primarily rests with the states); Richmond Boro Gun Club, Inc. v. City of New York, 97 F.3d 681, 687 (2d Cir. 1996) (recognizing in its preemption review of a city gun ordinance that areas of safety and health are traditionally occupied by the states). Accordingly, our analysis is guided by the assumption that Congress did not intend the OSH Act to preempt the Amendments. See Altria Group, 129 S.Ct. at 543.

B.

Congress's declared "purpose and policy" in enacting the OSH Act was "to assure so far as possible every working man and woman in the Nation safe and healthful working conditions and to preserve our human resources." 29 U.S.C. § 651(b). To effect its stated purpose, Congress authorized the Secretary of Labor and OSHA to set and enforce occupational safety and health standards for businesses. See 29 U.S.C. § 651(b)(3); see also OSHA's Role,

9

http://www.osha.gov/oshinfo/mission.html. In addition to requiring employers' compliance with OSHA's promulgated standards, see 29 U.S.C. § 654(a)(2), Congress imposed upon employers a general duty to "furnish to each of his employees employment and a place of employment which are free from recognized hazards that are causing or are likely to cause death or serious physical harm." 29 U.S.C. § 654(a)(1). This provision of the OSH Act, known as the general duty clause, was not meant to "be a general substitute for reliance on standards, but would simply enable the Secretary to insure the protection of employees who are working under special circumstances for which no standard has yet been adopted." S. Rep. No. 91-1282, at 5186 (1970).

The original impetus behind the OSH Act was danger surrounding traditional work-related hazards. See 29 U.S.C. § 651(a) (noting the OSH Act arose from concern surrounding "personal injuries and illnesses arising out of work situations"); S. Rep. 91-1282, at 5178 (describing at length the problems of industrial accidents and occupational diseases, without referencing workplace violence). In recent years, however, OSHA has recognized workplace violence as a serious safety and health issue. See, e.g., Workplace Violence, http://www.osha.gov/SLTC/workplaceviolence/index.html (a section of OSHA's website devoted to workplace violence). To that end, OSHA has issued voluntary guidelines and recommendations for employers seeking to reduce the risk of workplace violence in at-risk industries. See Guidelines for Preventing

10

Workplace Violence for Health Care and Social Service Workers and

Recommendations for Workplace Violence Prevention Programs in Late-Night

Retail Establishments, both available at

http://www.osha.gov/SLTC/workplaceviolence/solutions.html.  OSHA has not,

however, promulgated any mandatory standards regarding workplace violence.

## C.

Because the absence of *any* specific OSHA standard on workplace violence

is undisputed, the district court correctly recognized that the only possible area of

OSH Act preemption was under the general duty clause and the OSH Act's

overarching purpose.  Thus, in finding preemption, the district court held that gun-

related workplace violence was a "recognized hazard" under the general duty clause,

and, therefore, an employer that allows firearms in the company parking lot may

violate the OSH Act.  We disagree.  OSHA has not indicated in *any* way that

employers should prohibit firearms from company parking lots.  OSHA's website,

guidelines, and citation history do not speak at all to any such prohibition.  In fact,

OSHA *declined* a request to promulgate a standard banning firearms from the

workplace.  See Standards Interpretations Letter, September 13, 2006, available at

2006 WL 4093048.  In declining this request, OSHA stressed reliance on its

*voluntary* guidelines and deference "to other federal, state, and local law-

enforcement agencies to regulate workplace homicides."  Id.  OSHA is aware of the

controversy surrounding firearms in the workplace and has consciously decided *not*

11

to adopt a standard. Thus, we are not presented with a situation where the general duty clause applies because OSHA has been unable to promulgate a standard for an "unanticipated hazard." Teal v. E.I. DuPont de Nemours and Co., 728 F.2d 799, 804 (6th Cir. 1984) (recognizing the purpose of the general duty clause was to cover unanticipated hazards that were not covered by a specific regulation); see also Reich v. Arcadian Corp., 110 F.3d 1192, 1196 (5th Cir. 1997) ("Courts have held that enforcement through the application of standards is preferred because standards provide employers notice of what is required under the OSH Act.").

The district court's conclusion is also belied by the only opinion issued by an Administrative Law Judge (ALJ) concerning a general duty clause violation due to workplace violence. See Megawest Fin., Inc., 1995 OSAHRC Lexis 80 (May 8, 1995). In Megawest, the Secretary of Labor cited the operator of an apartment community located in a rough neighborhood for failing to take steps to prevent residents' violent acts. See id. at *1-2, *6-7. The ALJ *reversed* the Secretary's citation, ruling that potential violent behavior by residents did *not* constitute a "recognized hazard" within the meaning of the general duty clause. Id. at *32. In reversing the citation, the ALJ expressed the difficulties associated with requiring employers to abate hazards of random physical violence. See id. at *28 (recognizing that the "hazard of physical assault . . . arises not from the processes or materials of the workplace, but from the anger and frustration of people"). The ALJ stressed that an employee's general fear that he or she may be subject to violent attacks is *not*

12

enough to require abatement of a hazard under the general duty clause. See id. at *27; see also Pa. Power & Light Co. v. Occupational Health and Safety Review Comm'n, 737 F.2d 350, 354 (3d Cir. 1984) (recognizing that an employer's "duty does not extend to the abatement of dangers created by unforeseeable or unpreventable employee misconduct"); Pratt & Whitney Aircraft v. Sec'y of Labor, 649 F.2d 96, 104 (2d Cir. 1981) (indicating the OSH Act only requires employers to "guard against significant risks, not ephemeral possibilities"); Nat'l Realty and Construction Co., Inc. v. Occupational Safety and Health Review Comm'n, 489 F.2d 1257, 1266 (D.C. Cir. 1973) (noting that "[a] demented, suicidal, or willfully reckless employee may on occasion circumvent the best conceived and most vigorously enforced safety regime").

Undeterred by OSHA's and Megawest's express restraint in policing social behavior via the general duty clause, the district court held firearms stored in locked vehicles on company property may constitute a "recognized hazard." In so finding, the district court relied heavily on OSHA's general statement that employers may be cited for a general duty clause violation "[i]n a workplace where the risk of violence and serious personal injury are significant enough to be 'recognized hazards.'" Standard Interpretations Letter, December 10, 1992, available at http://www.osha.gov/SLTC/workplaceviolence/standards.html. The district court also relied on the ALJ's indication in Megawest that it *might* be possible to violate the general duty clause for failure to prevent workplace

13

violence. See id. at *29 (noting a high standard of proof is necessary to show that an employer recognized the hazard of workplace violence). Despite these general statements, OSHA's action (or inaction) regarding this matter undermines the district court's conclusion. The broad meaning of "recognized hazard" espoused by the district court is simply too speculative and unsupported to construe as the "clear and manifest purpose of Congress." Altria Group, 129 S.Ct. at 543; see also Oil, Chemical & Atomic Workers v. Am. Cyanamid Co., 741 F.2d 444, 449 (D.C. Cir. 1984) (refusing to apply a broad meaning of "hazard" under the general duty clause and instead "confin[ing] the term 'hazards' under the general duty clause to the types of hazards [the Court] kn[e]w Congress had in mind").[8]

D.

The district court further reasoned the Amendments thwart the overall purpose

---

[8] Despite the district court's assertion to the contrary, its definition of "hazard" is not supported by Psychiatric Hospital in Chicago Cited by OSHA for Workplace Violence, 23 O.S.H. Rep. (BNA) 646 (1993), in which a psychiatric hospital was cited under the general duty clause for failing to protect its workers from patients' violent behavior. A primary function of a psychiatric hospital's work is to manage unstable and often violent behavior. As such, the conduct in Psychiatric Hospital involved injuries "arising out of work situations." 29 U.S.C. § 651(a). In contrast, nothing about the Amendments' proviso that employers allow employees to store firearms in locked vehicles on company property implicates the fact-specific circumstances present in Psychiatric Hospital and that are required by OSHA to constitute a general duty clause violation. See Standard Interpretations Letter, Dec. 10, 1992, *supra* (noting that general duty clause violations for incidents involving workplace violence are *"entirely dependent upon the specific facts, which will be unique in each situation"*) (emphasis added).

14

and objective of the OSH Act. We disagree. The OSH Act is *not* meant to interfere "with states' exercise of police powers to protect their citizens." Lindsey v. Caterpillar, Inc., 480 F.3d 202, 208 (3d Cir. 2007) (citation omitted); see also Gade, 505 U.S. at 96 (noting "[f]ederal regulation of the workplace was not intended to be all encompassing"); Florida Retail Federation, Inc. v. Attorney General, 576 F. Supp. 2d 1281, 1298 (N.D. Fla. 2008) (stating in its rejection of a nearly identical challenge to the Florida "guns-at-work" statute that "[t]he OSH Act is not a general charter for courts to protect worker safety"); Megawest, 1995 OSAHRC Lexis 80, at *4 (recognizing that "enforcement in [the] arena [of workplace violence] could place extraordinary burdens on an employer requiring it to anticipate the possibility of civic disorder"). As such, "state laws of general applicability . . . that do not conflict with OSHA standards and that regulate conduct of workers and non-workers alike [are] generally *not* . . . preempted." Gade, 505 U.S. at 107 (emphasis added).

Here, the Amendments conflict with *no* OSHA standard. Moreover, the Oklahoma Court of Criminal Appeals defined the Amendments as "public crimes" of general applicability "concern[ing] protection of the community as a whole rather than individual citizens." Whirlpool, 110 P.3d at 86. Thus, while the Amendments may "have a 'direct and substantial effect' on worker safety, they cannot fairly be characterized as 'occupational' standards, because they regulate workers simply as members of the general public." Gade, 505 U.S. at 107. The district court's decision interferes with Oklahoma's police powers, see Lindsey, 480 F.3d at 208, and

15

essentially promulgates a court-made safety standard—a standard which OSHA has explicitly refrained from implementing on its own.[9] Such action is beyond the province of federal courts. See Chevron, U.S.A., Inc. v. Natural Resources Def. Council, 467 U.S. 837, 843-44 (1984) (holding that deference must be given to an administrative agency in filling any gaps in regulations).

In sum, the facts before us do not approach the level necessary to overcome "the assumption that the historic police powers of the States [are] not to be superseded by the Federal Act." Altria Group, 129 S.Ct. at 543. We understand Plaintiffs may disagree with the wisdom of the Amendments. Our task, however, is not to second-guess the Oklahoma legislature, but rather to interpret the Congressional intent behind the OSH Act and its general duty clause. Accordingly, we hold that Congress did not clearly intend the OSH Act to preempt the Amendments.

### III.

The district court rejected Plaintiffs' argument that the Amendments are an unconstitutional taking of private property and a violation of Plaintiffs' due process right to exclude others from their property. Plaintiffs raise these arguments as an

---

[9] We note that OSHA recently issued a letter to Oklahoma State Senator Jerry Ellis in response to the present case stating that "[g]un related violence is not a recognized occupational hazard in industry as a whole" and that "[OSHA] do[es] not believe that, as a general matter, the general duty clause of the OSH Act preempts [the Oklahoma Amendments]." Letter from Thomas Stohler, Acting Assistant Sec'y of Labor, to Jerry Ellis, Oklahoma State Senate (Jan. 16, 2009).

alternative grounds for affirmance, however, and we address them accordingly. See

Medina v. City and County of Denver, 960 F.2d 1493, 1495 n.1 (10th Cir. 1992)

("[W]e are free to affirm a district court decision on any grounds for which there is

a record sufficient to permit conclusions of law, even grounds not relied upon by the

district court."). As a matter of law, we review Plaintiffs' challenge to the

constitutionality of the Amendments de novo. See Powers v. Harris, 379 F.3d 1208,

1214 (10th Cir. 2004).

## A.

Regulation of private property may be so onerous that it violates the Takings

Clause of the Fifth Amendment and requires the government to provide

compensation. See Lingle v. Chevron U.S.A., Inc., 544 U.S. 528, 536-37 (2005).

Regulatory acts requiring payment are either (1) a *per se* taking, id. at 538, or (2) a

taking as characterized by the standards set forth in Penn Central Transp. Co. v. City

of New York, 438 U.S. 104 (1978). One category of *per se* takings is "where the

government requires an owner to suffer a permanent physical invasion of her

property." Lingle, at 538. Such regulatory action is often referred to as a "physical"

taking. Id. at 548. A sub-category of physical *per se* takings is a "land-use

exaction" in which the "government demands that a landowner dedicate an easement

allowing public access to her property as a condition of obtaining a development

permit." Id. at 546 (citing Nollan v. Ca. Coastal Comm'n, 483 U.S. 825 (1987) and

Dolan v. City of Tigard, 512 U.S. 374 (1994)). Such demands by the government are

17

"so onerous that, outside the exactions context, they would be deemed *per se* physical takings." Id. at 547.[10]

Recognizing that a permanent physical invasion by the government has not occurred here in the traditional sense, Plaintiffs argue the Amendments are a physical *per se* taking because they require Plaintiffs to provide an easement for individuals transporting firearms. Thus, the argument goes, the Amendments constitute a permanent physical invasion akin to the "land-use exaction" takings in Nollan and Dolan. We do not find Plaintiffs' *per se* taking argument persuasive. A *per se* taking in the constitutional sense requires a permanent physical occupation or invasion, not simply a restriction on the use of private property. See Loretto v. Teleprompter Manhattan CATV Corp. et al., 458 U.S. 419, 426-34 (1982). Here, the Amendments are most accurately characterized as a restriction on Plaintiffs' use of their property. In Nollan and Dolan, specific, individual landowners were forced to dedicate portions of their privately owned land for *public* use in exchange for a development permit from the local governing authority. See Lingle, 544 U.S. at 546. In contrast to the regulatory acts in Nollan and Dolan, the Amendments (1) apply to *all* property owners, not just Plaintiffs, (2) merely limit Plaintiffs *use* of their property, and (3) do *not* require Plaintiffs to deed portions of their property over to

---

[10] The second category of *per se* takings, which is not at issue here, is known as a "total regulatory taking," id. at 548, and involves regulations that deprive an owner of all economically beneficial use of his or her property. Id. at 538.

18

the state for public use. See Dolan, 512 U.S. at 385. Thus, the specific set of circumstances present in Nollan and Dolan are simply not applicable here. See, e.g., Lingle, 544 U.S. at 546-47 (describing the specific land-use exaction facts present in Nollan and Dolan); City of Monterey v. Del Monte Dunes at Monterey, Ltd., 526 U.S. 687, 702-03 (1999) (noting that the rough proportionality test used to find a taking in Nollan and Dolan is restricted to the "special context" of land-use exactions).

Rather, the facts here are more analogous to Pruneyard Shopping Center v. Robins, 447 U.S. 74 (1980). In Pruneyard, California's constitutional protection of free speech rights prevented owners of a private shopping center from prohibiting the circulation of petitions on the owner's property. See id. at 77-78. Despite the fact that individuals circulating petitions may have "physically invaded" the owner's property, id. at 84, the Supreme Court held that California's requirement that property owners recognize state-protected rights of free expression and petition "clearly [did] not amount to an unconstitutional infringement of appellants' property rights under the Takings Clause." Id. at 83. As in Pruneyard, Plaintiffs have not suffered an unconstitutional infringement of their property rights, but rather are required by the Amendments to recognize a state-protected right of their employees. See id. at 81 (noting that the state may exercise its police power to adopt individual liberties more expansive than those conferred by the Federal Constitution). As such, we conclude that Plaintiffs have not suffered a *per se* taking.

19

Plaintiffs argue that, even if the Amendments are not a *per se* taking, a taking has nonetheless occurred under the standards set forth in Penn Central. Penn Central establishes that while a regulatory act may not constitute a *per se* taking, it can be "functionally equivalent to the classic taking in which government directly appropriates private property or ousts the owner from his domain." Lingle, 544 U.S. at 539. The major factors under the Penn Central inquiry are (1) "[t]he economic impact of the regulation on the claimant," (2) "the extent to which the regulation has interfered with distinct investment-backed expectations," and (3) "the character of the governmental action." Penn Central, 438 U.S. at 124. In essence, Penn Central focuses on "the magnitude of a regulation's economic impact and the degree to which it interferes with legitimate property interests." Lingle, 544 U.S. at 540.

Plaintiffs' takings argument also fails under the Penn Central inquiry. First, the only economic impact cited by Plaintiffs is the general claim (located in a footnote of their brief) that allowing firearms onto an employer's property inevitably increases costs linked to workplace violence. A constitutional taking requires more than an incidental increase in potential costs for employers as a result of a new regulation. See id. at 538 ("Government hardly could go on if to some extent values incident to property could not be diminished without paying for every such change in the general law.") (quoting Pa. Coal Co. v. Mahon, 260 U.S. 393, 413 (1922)). Second, Plaintiffs do not assert *any* interference with their investment-backed expectations, and, therefore, "have failed to demonstrate that the 'right to exclude

20

others' is so essential to the use or economic value of their property that the state-authorized limitation of it amount[s] to a 'taking.'" Pruneyard, 447 U.S. at 84. Third, the governmental action at issue here involves "public crimes" of general applicability "concern[ing] protection of the community as a whole rather than individual citizens." Whirlpool, 110 P.3d at 86. Plaintiffs must expect "the uses of [their] property to be restricted, from time to time, by various measures newly enacted by the state in legitimate exercise of its police powers." Clajon Prod. Corp. v. Petera, 70 F.3d 1566, 1579 (10th Cir. 1995); see also Penn Central, 438 U.S. at 125 (noting that laws meant to support the health, safety, morals, and general welfare of the entire community are generally upheld even if they destroy or adversely affect private property interests).

B.

In reality, Plaintiffs are less concerned about "compensation for a taking of [their] property . . . but rather [seek] an injunction against the enforcement of a regulation that [they] allege[] to be fundamentally arbitrary or irrational." Lingle, 544 U.S. at 544. As such, Plaintiffs' due process claim, *i.e.,* the Amendments deprive Plaintiffs of the right to exclude others from their property, is more apt than their takings argument. A government regulation "that fails to serve any legitimate governmental objective may be so arbitrary or irrational that it runs afoul of the Due Process Clause." Id. at 542. The Supreme Court, however, has "long eschewed . . . heightened scrutiny when addressing substantive due process challenges to

21

government regulation." Id. at 545. Accordingly, we review the Amendments under a "rational basis" standard. See Powers, 379 F.3d at 1215 (regulations not subject to heightened scrutiny require rational basis review); Crider v. Bd. of County Comm'rs, 246 F.3d 1285, 1289-90 (10th Cir. 2001) (regulations restricting the use of property are subject to rational basis review). Under rational basis review, "we look only to whether a 'reasonably conceivable' rational basis exists." Id. at 1290 (citation omitted). We are not allowed to second guess the wisdom of legislative policy-determinations. Powers, 379 F.3d at 1217.

One professed purpose of the Amendments is the protection of the broader Oklahoma community. We need not decide the long-running debate as to whether allowing individuals to carry firearms enhances or diminishes the overall safety of the community. The very fact that this question is so hotly debated, however, is evidence enough that a rational basis exists for the Amendments. See Village of Euclid v. Ambler Realty Co., 272 U.S. 365, 388 (1926) (noting that if a regulation is fairly debatable, the legislative judgment must control). In addition to the Amendment's purpose of increasing safety, one could argue that the Amendments are simply meant to expand (or secure) the Second Amendment right to bear arms. See Pruneyard, 447 U.S. at 81 (noting that the state may exercise its police power to adopt individual liberties more expansive than those conferred by the Federal Constitution). Because we cannot say the Amendments have no reasonably

22

conceivable rational basis, Plaintiffs' due process claim must fail.[11]

For the foregoing reasons, we **reverse** the district court's grant of a permanent injunction.

---

[11] Plaintiffs also argue the Amendments are unconstitutionally vague. Facial vagueness challenges "to statutes which do not involve First Amendment freedoms must be examined in light of the facts of the case at hand. One to whose conduct a statute clearly applies may not successfully challenge it for vagueness." United States v. Day, 223 F.3d 1225, 1228 (10th Cir. 2000) (quoting Village of Hoffman Estates v. Flipside, 455 U.S. 489, 495 n.7 (1982)). We agree with the district court that the Amendments clearly forbid the conduct Plaintiffs seek to continue, *i.e.*, prohibiting employees from storing firearms in vehicles on company property. See Conoco Phillips, 520 F. Supp. 2d at 1299-1301. Accordingly, the district court correctly denied Plaintiffs' facial vagueness challenge.