# United States Court of Appeals
### FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued November 12, 2013          Decided April 11, 2014

No. 12-1375

SEAWORLD OF FLORIDA, LLC,
PETITIONER

v.

THOMAS E. PEREZ, SECRETARY, UNITED STATES
DEPARTMENT OF LABOR,
RESPONDENT

On Petition for Review of a Final Order of the
Occupational Safety & Health Review Commission

*Eugene Scalia* argued the cause for petitioner. With him on the briefs were *Baruch A. Fellner* and *Daniel P. Rathbun*.

*Amy S. Tryon*, Attorney, U.S. Department of Labor, argued the cause for respondent. With her on the brief were *Joseph M. Woodward*, Associate Solicitor, *Charles F. James*, Counsel for Appellate Litigation, and *Kristen M. Lindberg*, Attorney.

Before: GARLAND, *Chief Judge*, and ROGERS and KAVANAUGH, *Circuit Judges*.

Opinion for the Court by *Circuit Judge* ROGERS.

Dissenting Opinion by *Circuit Judge* KAVANAUGH.

ROGERS, *Circuit Judge*: SeaWorld of Florida, LLC, operates a theme park in Orlando, Florida, that is designed to entertain and educate paying customers by displaying and studying marine animals. Following the death of one of SeaWorld's trainers while working in close contact with a killer whale during a performance, the Occupational Safety and Health Review Commission found that SeaWorld had violated the general duty clause, § 5(a)(1) of the Occupational Safety and Health Act of 1970, 29 U.S.C. § 654(a)(1), by exposing the trainers to recognized hazards when working in close contact with killer whales during performances, and that the abatement procedures recommended by the Secretary of Labor were feasible. SeaWorld challenges the order with respect to one citation. Concluding its challenges are unpersuasive, we deny the petition for review.

**I.**

On February 24, 2010, SeaWorld trainer Dawn Brancheau was interacting with Tilikum, a killer whale, during a performance before a live audience in a pool at Shamu Stadium in Orlando. Ms. Brancheau was reclined on her back on a platform a few inches below the water surface. Tilikum was supposed to mimic her behavior by rolling over. Instead, the killer whale grabbed her and pulled her off the platform into the pool, refusing to release her. She suffered traumatic injuries and drowned as a result of Tilikum's actions.

The Secretary of Labor issued three citations to SeaWorld after an investigation by an Occupational Safety and Health Administration ("OSHA") compliance officer. Only the second citation is at issue. It alleged two instances of a "willful" violation of the general duty clause for exposing animal trainers to the recognized hazards of drowning or injury when working

with killer whales during performances. The first instance related to animal trainers working with Tilikum being exposed to "struck-by and drowning hazards" by being "allowed unprotected contact with Tilikum" while conducting "'drywork' performances on pool ledges, slideouts and platforms." Citation 2, Instance (a). In SeaWorld's terms, when trainers are out of the pool or on submerged ledges called "slideouts" in water no deeper than their knees, their interactions with killer whales are called "drywork." Any interaction in deeper water is "waterwork." According to the Secretary, "[a]mong other methods, one feasible and acceptable means of abatement would be to not allow animal trainers to have any contact with Tilikum unless they are protected by a physical barrier." *Id.* The second instance concerned animal trainers working with killer whales other than Tilikum who were exposed to struck-by and drowning hazards when they were "allowed to engage in 'waterwork' and 'drywork' performances with the killer whales without adequate protection." Citation 2, Instance (b). The Secretary listed as possible abatement methods "prohibit[ing] animal trainers from working with killer whales, including 'waterwork' or 'dry work,' unless the trainers are protected through the use of physical barriers or through the use of decking systems, oxygen supply systems or other engineering or administrative controls that provide the same or greater level of protection for the trainers." *Id.* The Secretary proposed a penalty of $70,000.

Following an evidentiary hearing, the Administrative Law Judge ("ALJ") found that on February 24, 2010, a "performance" was still in progress when Tilikum seized Ms. Brancheau and pulled her into the pool water. *SeaWorld of Fla., LLC*, 2012 WL 3019734, slip op. at 16, at *12 (No. 10-1705, 2012). (A customer had taken a video of the performance.) The ALJ found that the first and third elements of a violation of the general duty clause — existence of a workplace condition presenting a hazard that likely caused death or serious physical

harm — were established by the events on February 24, 2010: Ms. Brancheau's death demonstrated that close contact with killer whales was a hazard likely to cause death or serious injury. Based on evidence regarding three previous deaths involving killer whales (beginning in 1991 with Tilikum), SeaWorld's written training manuals and safety lectures as implemented specifically to Tilikum, and SeaWorld's incident reports, the ALJ found that the Secretary had established by "abundant" record evidence that "SeaWorld recognized the hazard created when its trainers worked in close contact with Tilikum during drywork performances," satisfying the second element of a violation. *Id.* at 25–26, *19. Further, the ALJ found that evidence, including SeaWorld's incident reports, established that SeaWorld recognized the hazard when trainers worked in close contact with other killer whales; SeaWorld's statistics regarding the predictability of killer whale behavior, on the other hand, were unpersuasive because not based on rigorous, scientific data. The ALJ concluded that SeaWorld's claim that "it was unaware working with killer whales presents a recognized hazard is difficult to reconcile with numerous comments made over the years by SeaWorld management personnel, including [two] corporate curators of animal training . . . [whose] comments were documented and circulated among all of the SeaWorld parks." *Id.* at 29, *22.

The ALJ also found that the Secretary had established the fourth element of a violation: feasible abatement of the hazard for trainers working with Tilikum and other killer whales. SeaWorld had not argued, the ALJ noted, that it is infeasible to install barriers or implement a minimum distance between trainers and whales, but rather "considers the extensive safety training of its trainers and the operant conditioning of its killer whales to be an adequate means of abatement that materially reduces the hazard the killer whales present to the trainers." *Id.* at 34, *25. The ALJ found the Secretary had met her burden to

show SeaWorld's safety program is inadequate. Despite SeaWorld's contention that its operant conditioning "materially reduces the recognized hazard," *id.*, the ALJ concluded that "SeaWorld's reliance on its trainers to recognize precursors and prevent unpredictable behavior by the killer whales runs counter to the requirements of the Act. 'The duty to comply with section 5(a)(1) . . . rests with the employer.'" *Id.* at 36, *27 (quoting *Armstrong Cork Co.*, 8 BNA OSHC 1070, 1074, 1980 WL 10754, at *5 (No. 76-2777, 1980)). The ALJ further concluded that "SeaWorld holds trainers to a near-impossible standard set by upper management, who engage in a form of Monday morning quarterbacking." *Id.* at 37, *28. Additionally, the ALJ noted that SeaWorld had already implemented the means of abatement recommended by the Secretary for trainers working with Tilikum — namely, maintaining a minimum distance from the killer whale, or imposing a physical barrier between the killer whale and trainers — and concluded the same or similar abatement involving other killer whales was no less feasible.

Although crediting the testimony of a SeaWorld curator of animal training regarding the educational and inspirational justification for continuing "waterwork" with killer whales, the ALJ concluded that justification "must be measured against the risk incurred by allowing trainers to interact closely with killer whales." *Id.* at 42, *31. Observing that OSHA has "no specific standard" regulating employees working in close contact with killer whales, and that the Secretary had presented no evidence SeaWorld had a "heightened awareness of the illegality of its conduct" or manifested "plain indifference to employee safety," *id.* at 44–45, *33, the ALJ found that violations were "serious," not "willful," and imposed a fine of $7,000 for the general duty clause violation in Citation 2, emphasizing that his order was limited to show performances. *Id.* at 45–47, *34–35. SeaWorld unsuccessfully sought discretionary review by the Commission,

whereupon the ALJ's decision and order became final. *See* 29 C.F.R. § 2200.90(d). SeaWorld petitions for review of the general duty violation.

## II.

The general duty clause, § 5(a)(1) of the Occupational Safety and Health Act, provides: "Each employer [ ] shall furnish to each of his employees employment and a place of employment which are free from recognized hazards that are causing or are likely to cause death or serious physical harm to his employees." 29 U.S.C. § 654(a)(1). As explained by the House Committee on Education and Labor, "[b]earing in mind the fact that there is no automatic penalty for violation of the general duty, this clause enables the Federal Government to provide for the protection of employees who are working under such *unique* circumstances that no standard has yet been enacted to cover this situation." H.R. REP. NO. 91-1291, at 21–22 (1970) (emphasis in original). In a seminal case this court, in turn, observed that "[t]hough novel in approach and sweeping in coverage, the legislation is no more drastic than the problem it aims to meet." *Nat'l Realty & Constr. Co. v. OSHRC*, 489 F.2d 1257, 1260–61 (D.C. Cir. 1973) (footnote omitted). Notwithstanding the "unqualified and absolute" textual imperative that the workplace be "free" of the recognized hazard, *id*. at 1265, the court further observed that "Congress quite clearly did not intend the general duty clause to impose strict liability: The duty was to be an achievable one," *id*. at 1265–66. So understood, the court held that "[a]ll preventable forms and instances of hazardous conduct must . . . be entirely excluded from the workplace." *Id.* at 1266–67. *See also Cont'l Oil Co. v. OSHRC*, 630 F.2d 446, 448 (6th Cir. 1980); *Gen. Dynamics Corp., Quincy Shipbuilding Div. v. OSHRC*, 599 F.2d 453, 458, 464 (1st Cir. 1979); *Titanium Metals Corp. of Am. v. Usery*, 579 F.2d 536, 543–44 (9th Cir. 1978); *Getty Oil Co. v. OSHRC*, 530 F.2d 1143, 1145 (5th Cir. 1976); *Brennan v.*

*OSHRC*, 501 F.2d 1196, 1198, 1200 (7th Cir. 1974); *Brennan v. OSHRC*, 502 F.2d 946, 951–52 (3d Cir. 1974); *REA Express, Inc. v. Brennan*, 495 F.2d 822, 826 (2d Cir. 1974).

"To establish a violation of the General Duty Clause, the Secretary must establish that: (1) an activity or condition in the employer's workplace presented a hazard to an employee, (2) either the employer or the industry recognized the condition or activity as a hazard, (3) the hazard was likely to or actually caused death or serious physical harm, and (4) a feasible means to eliminate or materially reduce the hazard existed." *Fabi Constr. Co. v. Sec'y of Labor*, 508 F.3d 1077, 1081 (D.C. Cir. 2007) (citation omitted). Tempering the range of potential remedies that might be imposed upon finding a violation of the clause, the court explained: "In other words, 'the *Secretary* must prove that a reasonably prudent employer familiar with the circumstances of the industry would have protected against the hazard in the manner specified by the Secretary's citation.'" *Id.* (quoting *L.R. Willson & Sons, Inc. v. OSHRC*, 698 F.2d 507, 513 (D.C. Cir. 1983)) (emphasis in original).

SeaWorld contests only the second and fourth elements regarding recognized hazard and feasibility. In challenging the general duty citation, SeaWorld does not perforce contend that the Secretary of Labor or the Occupational Safety and Health Review Commission lack legal authority to require employers to provide a reasonably safe working environment for employees. Rather, SeaWorld takes issue with the interpretation by these officials of what constitutes a recognized hazard that would subject an employer to citation under the Occupational Safety and Health Act. First, SeaWorld contends that the finding that it exposed its employees to a "recognized hazard" is unsupported by substantial evidence. Second, it contends that "when some risk is inherent in a business activity, that risk cannot constitute a 'recognized hazard.'" Pet'r Br. at 33. Third, it contends that

the ALJ's decision was based on unreliable expert testimony about the extent of killer whale predictability after SeaWorld's training and precautions. As regards the feasibility of physical barriers and minimum distances SeaWorld contends that the Secretary failed to prove feasible abatement methods (or that SeaWorld had already implemented these measures), and that the ALJ failed to consider evidence these abatement measures present additional hazards and erred because eliminating close contact changes the nature of a trainer's job. Finally, SeaWorld contends the general duty clause is unconstitutionally vague as applied because SeaWorld lacked fair notice of the Secretary's abatement measures.

The court must uphold the Commission's decision unless it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Fabi Constr. Co.*, 508 F.3d at 1080 (quoting 5 U.S.C. § 706(2)(A)) (internal quotation marks omitted); *see A.E. Staley Mfg. Co. v. Sec'y of Labor*, 295 F.3d 1341, 1345 (D.C. Cir. 2002). The factual findings of the Commission, "if supported by substantial evidence on the record considered as a whole, shall be conclusive." 29 U.S.C. § 660(a); *see, e.g.*, *Fabi Constr. Co.*, 508 F.3d at 1081. Under this standard, the court must "uphold Commission findings so long as there is 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *AJP Constr., Inc. v. Sec'y of Labor*, 357 F.3d 70, 73 (D.C. Cir. 2004) (citations omitted). Likewise, the court "must accept the ALJ's credibility determinations . . . unless they are patently unsupportable." *Id.* (ellipsis in original) (citation omitted). The court will "defer to the Secretary's interpretation of the Act and regulations, upholding such interpretations so long as they are consistent with the statutory language and otherwise reasonable." *Anthony Crane Rental, Inc. v. Reich*, 70 F.3d 1298, 1302 (D.C. Cir. 1995) (citing *Martin v. OSHRC*, 499 U.S. 144, 150–51 (1991)).

**A.**

Whether a work condition poses a recognized hazard is a question of fact. *See Baroid Div. of NL Indus., Inc. v. OSHRC*, 660 F.2d 439, 446 (10th Cir. 1981). Substantial evidence supports the finding that "drywork" and "waterwork" with killer whales were recognized hazards. Tilikum is a 32-year-old male killer whale with known aggressive tendencies who in 1991 killed a whale trainer at a marine park in Vancouver, British Columbia. SeaWorld had established special protocols for Tilikum, which prohibited "waterwork" and, among other things, required non–killer whale personnel and guests to stay five feet behind pool walls or three feet from Tilikum's head, indicating that SeaWorld recognized the possibility of harm to people standing outside of the pool on land. Although "drywork" with Tilikum continued, SeaWorld limited it to a team of experienced trainers who used extra caution. The caution with which SeaWorld treated Tilikum even when trainers were poolside or on "slideouts" in the pool indicates that it recognized the hazard the killer whale posed, not that it considered its protocols rendered Tilikum safe.

As to other killer whales, SeaWorld suggests that close contact with these whales was not a recognized hazard because all whales behave differently and its incident reports help SeaWorld improve training. But SeaWorld's incident reports demonstrate that it recognized the danger its killer whales posed to trainers notwithstanding its protocols. At the time of Ms. Brancheau's death, seven killer whales were at the Orlando park. Even though SeaWorld had not recorded incident reports on all of its killer whales, a substantial portion of SeaWorld's killer whale population had at least one reported incident. The ALJ also relied on the many comments by SeaWorld management personnel, including corporate curators of animal training, who described the need for caution around killer whales generally, not only around certain killer whales. Killer whales bit trainers'

body parts on several occasions (although not generally puncturing skin) and in 2006 a killer whale pulled a trainer underwater by the foot and submerged him repeatedly for approximately 10 minutes. Although this incident occurred during "waterwork," substantial evidence supports the finding with regard to "drywork" as well. On numerous occasions, trainers fell or were pulled into the water, as later happened with Tilikum and Ms. Brancheau, or killer whales lunged out of the water toward trainers. These incidents constitute substantial evidence to support the ALJ's finding that "drywork" was also a recognized hazard.

SeaWorld's position is that working with killer whales was not a recognized hazard because its training and safety program adequately controlled the risk. To train its killer whales, SeaWorld uses "operant conditioning" to reinforce desired behaviors with food or other rewards. It also trains its employees who work with killer whales to recognize particular behaviors that it calls "precursors," which indicate that the killer whales may act aggressively, and keeps detailed incident reports of when its killer whales had behaved aggressively or otherwise undesirably toward trainers, including pulling trainers into the pool. The Secretary presented evidence that the killer whales posed a hazard in spite of SeaWorld's safety measures. On multiple occasions, including the death of Ms. Brancheau, SeaWorld's incident reports indicated that the killer whales showed no immediate precursors of aggressive behavior or ignored SeaWorld's emergency procedures designed to make them cease aggressive behavior. Statements by SeaWorld managers do not indicate that SeaWorld's safety protocols and training made the killer whales safe; rather, they demonstrate SeaWorld's recognition that the killer whales interacting with trainers are dangerous and unpredictable and that even senior trainers can make mistakes during performances, and the managers repeatedly urged caution in working with the killer

whales.  The evidence thus supports the ALJ's finding that a recognized hazard existed, even beyond the impact of SeaWorld's safety protocols.

In relying on SeaWorld's safety program to establish a recognized hazard, the ALJ did not, as SeaWorld suggests, "invert[] the requirement of the General Duty Clause that the Secretary, 'as a threshold matter,' 'submit evidence proving . . . that the methods undertaken by the employer to address the alleged hazard were inadequate.'"  Pet'r Br. at 30 (quoting *U.S. Postal Serv.*, 2006 WL 6463045, at \*8 (OSHRC No. 04-0316, Nov. 20, 2006)) (ellipsis in brief).  In the *Postal Service* case, the Secretary alleged that letter carriers risked being hit by cars in dim or dark conditions and proposed carriers be required to wear reflective garments that complied with industry standards, but failed to show that carriers had been hit because of lack of visibility when wearing the reflective garments provided by their employer, *see id.* at \*2, \*9, or that the proposed reflective garments would have made a difference, *see id.* at \*9.  Here, there was substantial record evidence that SeaWorld recognized its precautions were inadequate to prevent serious bodily harm or even death to its trainers and that the residual hazard was preventable.

The remedy imposed for SeaWorld's violations does not change the essential nature of its business.  There will still be human interactions and performances with killer whales; the remedy will simply require that they continue with increased safety measures.  SeaWorld itself has limited human interactions.  After Ms. Brancheau's death in 2010, SeaWorld ceased "waterwork" with all of its killer whales.  It also imposed distance between trainers and Tilikum during drywork and, to a lesser degree, between other killer whales and trainers during drywork.  These self-imposed limitations are relevant to the assessment of which aspects of SeaWorld's business are essential

and indicate that the Secretary's remedy will not eliminate any essential element. SeaWorld does not assert (and at oral argument disavowed) that a public perception of danger to its trainers is essential to its business. *See* Oral Argument Recording at 15:05–16:05. Nor has SeaWorld ever argued that limiting interactions in the way that the remedy requires would have a detrimental economic impact on its profits. And SeaWorld is, after all, a for-profit entity owned, at times relevant to the Commission proceedings, by the Blackstone Group, an investment firm.

*Pelron Corp.*, 12 BNA OSHC 1833, 1986 WL 53616 (No. 82-388, 1986), on which SeaWorld relies, is inapposite. That case involved an enforcement action against a company that manufactured products by mixing, *inter alia*, ethylene oxide. *See id.* at *1. The ALJ had defined the alleged hazard as the "possibility" of accumulations of unreacted ethylene oxide, which the Commission found could never be prevented. *See id.* at *3. Thus, impliedly, the only remedy would have been to close the plant. Here, the Secretary and the Commission could reasonably conclude that the danger to SeaWorld's trainers during performances from killer whales can be prevented by use of physical barriers and distance, and closing SeaWorld is not at issue. The hazard killer whales pose during performances is not "so idiosyncratic and implausible" that it cannot be considered preventable. *Nat'l Realty & Constr. Co.*, 489 F.2d at 1266. SeaWorld controls its employees' access to and contact with its killer whales, unlike the employer in *Megawest Financial Inc.*, 17 BNA OSHC 1337, 1995 WL 383233, at *8–9 (No. 93-2879, 1995) (ALJ), who could not prevent the potentially criminal, violent actions of third parties residing in the apartment buildings it managed. SeaWorld's reliance on the Commission's observation in *Pelron* that "[s]ome industrial activities are by their very nature dangerous. To permit the normal activities in such an industry to be defined as a 'recognized hazard' within

the meaning of section 5(a)(1) is to eliminate an element of the Secretary's burden of proof," *Pelron*, 1986 WL 53616, at \*3, is misplaced; the Commission was addressing the requirement that recognized hazards be "preventable" and "be defined in a way that . . . identifies conditions or practices over which the employer can reasonably be expected to exercise control." *Id.* (citing *Nat'l Realty & Constr. Co.*, 489 F.2d at 1266; *Davey Tree Expert Co.*, 11 BNA OSHC 1898, 1899 (No. 77-2350, 1984)).

To the extent SeaWorld maintains that close contact is integral to cleaning and caring for their animals (*i.e.*, "husbandry"), and that it was arbitrary and capricious to find a recognized hazard in the performance context but not in the husbandry context, its position is unfounded. Contact during husbandry was not at issue before the ALJ or the Commission. Regardless, although some aspects of husbandry may require close contact, according to SeaWorld's vice president for veterinary services, many procedures can be conducted in a medical pool with a lifting bottom that restricts the killer whale's mobility, or can be performed from poolside behind a short wall. In his opinion, notwithstanding performance-contact limitations, "SeaWorld is adequately caring for these animals to this day." Tr. ALJ Hearing at 1778 (Sept. 19, 2011).

SeaWorld's suggestion that because trainers "formally accepted and controlled their own exposure to . . . risks," the hazard of close contact with killer whales cannot be recognized, *see* Pet'r Br. at 40, contravenes Congress's decision to place the duty to ensure a safe and healthy workplace on the employer, not the employee. This court has long held "this duty is not qualified by such common law doctrines as assumption of risk, contributory negligence, or comparative negligence." *Nat'l Realty & Constr. Co.*, 489 F.2d at 1266 n.36. SeaWorld's reliance on *Oil, Chemical & Atomic Workers International Union v. American Cyanamid Co.*, 741 F.2d 444 (D.C. Cir.

1984), is misplaced; the alleged hazard in that case was the employer's policy prohibiting women of childbearing age from working in high lead-exposure positions unless they had been surgically sterilized, and the court held that "the general duty clause does not apply to a policy as contrasted with a physical condition of the workplace." *Id.* at 448. The court explained that the optional sterilization policy "does not affect employees while they are engaged in work or work-related activities." *Id.* at 449. The potential harm to SeaWorld's trainers exists in their workplace and involves conditions over which SeaWorld has control.

The Secretary and the Commission could also reasonably determine that the remedy does not go to the essence of SeaWorld's productions. SeaWorld has had no "waterwork" performances since Ms. Brancheau's death in 2010, and it temporarily suspended "waterwork" after other incidents, such as the killing of a trainer by a killer whale in 2009 at a non-SeaWorld park in Spain. With distance and physical barriers between Tilikum and trainers during drywork, Tilikum can still perform almost the same behaviors performed when no barriers were present. The nature of SeaWorld's workplace and the unusual nature of the hazard to its employees performing in close physical contact with killer whales do not remove SeaWorld from its obligation under the General Duty Clause to protect its employees from recognized hazards.

Our dissenting colleague's analysis, although framed as a question of who decides, Dissent at 1–2, acknowledges that Congress has vested in the Secretary and the Commission general authority to protect employees from unhealthy and unsafe work places, *see id.* at 2–3. Ignoring this court's precedent regarding congressional purpose and intent and stretching *Pelron* beyond its moorings, our colleague concludes *Pelron* is dispositive. Dissent at 6. Nothing the Commission

said in *Pelron* immunizes a workplace's dangerous "normal activities" from oversight; the Commission simply applied well-established law that only "preventable" hazards can be considered as recognized. *See Pelron*, 1986 WL 53616, at *3 (citing *Nat'l Realty & Constr. Co.*, 489 F.2d at 1266). This case is not *Pelron*. In *Pelron*, the Secretary had neither identified a preventable hazard nor proved "the inadequacy of Pelron's safety program," nor demonstrated the existence of additional safety measures. *See id.* Here, the Secretary identified a preventable hazard in "conditions or practices over which [SeaWorld] can reasonably be expected to exercise control." *Id.* Neither *Pelron* nor our precedent bar the Secretary from taking enforcement action when preventable dangerous activities in a theme park result in death or serious injury to an employee and feasible measures exist to abate the hazard.

Moreover, it is worth noting four rhetorical moves by our colleague. First, although maintaining that policy questions are not before the court, Dissent at 12, the first three pages of his opinion can only be read as raising the question: "When," in the dissent's words, "should we as a society paternalistically decide" that employees should be protected from "the risk of significant physical injury?" *Id.* at 1. This is a question to be answered by Congress, not this court. And Congress has done so. *See supra* at 6. Second, although this case is only about a single "entertainment show," our colleague repeatedly characterizes this case as being about the "*sports and* entertainment *industries*." Dissent at 2 (emphasis added). No one has described SeaWorld's killer whale performances as a "sport," and a *legal* argument that the "sports industry" should not be regulated by OSHA can be raised when and if OSHA attempts to do so. Until then, this court will not find that OSHA acted arbitrarily based on a few responses to hypotheticals in briefing or oral argument. Third, our colleague is simply wrong in saying that OSHA has "departed from tradition and stormed headlong

into a new regulatory arena," involving entertainment shows. *Id.* at 3. In fact, this is hardly the first time that OSHA has regulated the working conditions of such shows.[1] Fourth, and as a consequence, the parade of horribles presented by our colleague is not relevant here. This court, moreover, could easily generate a list of horribles on the other side, which, under our colleague's view, could not be distinguished. Many traditional industries can be extremely dangerous to their employees: construction, metal

---

[1] *See, e.g.*, *Murphy Enters., Inc*., 17 BNA OSHC 1477, 1995 WL 547935 (No. 93-2957, 1995) (ALJ) (upholding 1993 citation to carnival regarding operation of "a large Ferris wheel"); Interpretation Letter, Office of General Industry Enforcement, OSHA (Jan. 28, 1997), *available at* https://www.osha.gov/pls/oshaweb/ owadisp.show_document?p_table=INTERPRETATIONS&p_id=22 337 (stating that OSHA "is concerned with the safety and health of all workers in the entertainment industry" and that "theatrical employees need to be protected from all occupational safety and health hazards"); OSHA, Inspection 307495846, Walt Disney Entm't, Inc. (Feb. 11, 2004), *available at* http://osha.gov/pls/imis/ establishment.inspection_detail?id=307495846 (citing Walt Disney Entertainment for death of worker who was run over and killed by a float during a parade); OSHA Std. Interp. 1975.3, 2005 WL 3801567 (June 16, 2005) (stating that "OSHA's general industry standards" apply to employees working at "carnivals, amusement parks, and water parks"); Region 8 News Release, OSHA (Aug. 2, 2007), *available at* https://www.osha.gov/pls/oshaweb/ owadisp.show_document?p_table=NEWS_RELEASES&p_id=14362 (citing Denver Zoo for failing "to provide appropriate protocols to prevent inadvertent contact with dangerous animals"); *Western World, Inc.*, 2013 WL 7208643 (No. 07-0144, 2013) (ALJ) (upholding 2006 citation regarding a "reenactment of an Old West-style gunfight"); *see also* Region 2 News Release, OSHA (Mar. 4, 2011), *available at* https://www.osha.gov/pls/oshaweb/owadisp.show_document?p_tab le=NEWS_RELEASES&p_id=19362 (announcing OSHA's issuance of citations to the Broadway production of "Spider-Man" following injuries to cast members during flying routines).

pouring, logging, welding, firefighting, roofing, electrical power line installation, handling explosives. Yet these industries have been regulated pursuant to the Occupational Safety and Health Act, notwithstanding that employers could claim their employees were also "willing participants," "even in the face of known physical risk," *id.* at 1–2, or that the employees were taking part in "the 'normal activities' intrinsic to the industry," *id.* at 6.

Our colleague's main point appears to be that the Secretary and the Commission were arbitrary and capricious by failing to reasonably distinguish SeaWorld's killer whale shows from the NFL and NASCAR. It's all or nothing, the dissent suggests. Dissent at 10. Either OSHA must regulate SeaWorld's killer whale shows *and* the NFL *and* NASCAR — or it cannot regulate any of the three because no rational distinction is possible. *Id.* But SeaWorld offers nothing to show that it raised the NFL/NASCAR hypothetical before the Commission. The Occupational Safety and Health Act provides: "No objection that has not been urged before the Commission shall be considered by the court, unless the failure or neglect to urge such objection shall be excused because of extraordinary circumstances." 29 U.S.C. § 660(a); *Frank Lill & Son, Inc. v. Sec'y of Labor*, 362 F.3d 840, 844 (D.C. Cir. 2004). No principle of administrative law requires an agency to anticipate and distinguish a hypothetical that a party did not raise until its subsequent appellate briefs. *Cf. Appalachian Power Co. v. EPA*, 251 F.3d 1026, 1036 (D.C. Cir. 2001). Perhaps when squarely faced with that question OSHA will accept the dissent's argument that, under the *Brown & Williamson* principle, it cannot regulate sports regardless of statutory text because "Congress could not have intended" it. Dissent at 11 (quoting *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 160 (2000)). Perhaps OSHA will say, as did its appellate counsel in response to SeaWorld's counsel's hypothetical, that physical contact between players is "intrinsic" to professional football in

a way that it is not to a killer whale show. *See* Resp't Br. at 52. In any event, no principle of law requires a court, when reviewing a citation based on specific facts relating to one of several kinds of entertainment shows put on by a single employer, to reach beyond that citation and decide the hypothetical application of the statute to another industry.

Furthermore, in maintaining that the citation of SeaWorld was arbitrary and capricious in view of the dangerous nature of killer whale shows, our colleague overlooks that SeaWorld itself has implemented similar abatement measures and done so without any suggestion of harm to its profits. Substantial evidence supports the finding that close trainer contact with killer whales is not integral to SeaWorld's workplace. The scope of our review affords no occasion to "substitute our own judgment for that of the agency, but . . . examine[s] only 'whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment.'" *Wisc. Valley Improvement Co. v. FERC*, 236 F.3d 738, 745 (D.C. Cir. 2001) (quoting *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971)). We note, however, that had Congress intended all unsafe and unhealthy performances in the entertainment industry to be beyond the scope of employee protection, it could have included such an exemption in the Occupational Safety and Health Act, and it did not. "When that is Congress' purpose, it makes its intention clear by using language that makes express exceptions . . . or expressly permits the making of distinctions [the statute] would otherwise prohibit." *Miller v. Clinton*, 687 F.3d 1332, 1340 (D.C. Cir. 2012). For instance, Congress authorized the Secretary, after notice and hearing, to make "reasonable variations, tolerances, and exemptions to and from any or all provisions . . . as he may find necessary and proper to avoid serious impairment of the national defense." 29 U.S.C. § 665. SeaWorld does not contest that it is an "employer" under the Act.

Neither does SeaWorld point to anything in the Act or regulations that would require exemption of its shows, much less of all entertainment performances.

**B.**

Under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), expert testimony must "both rest[] on a reliable foundation and [be] relevant to the task at hand." *Id.* at 597. SeaWorld's challenge to the ALJ's decision to credit the testimony of the Secretary's expert with regard to the aggressive behavior of killer whales fails for the following reasons.

SeaWorld contends that the Secretary's expert's testimony was unreliable because his experience was confined to observing wild whales, he had not conducted any studies on captive whales, he admitted not knowing whether being in captivity altered killer whale behavior, and he had no experience training killer whales. Killer whales are found in all oceans of the world and live in long-term social groups. They are at the top of the food chain, and are called killer whales because they prey on other, larger whales and other marine animals; when in the wild they are not known to prey on humans. The Secretary's expert did not claim that he had expertise about killer whales in captivity, and the ALJ did not so qualify him; rather, the ALJ ruled that he "is qualified to talk about the nature of killer whales in terms for their predictability of behavior" and about "safety measures to be taken." Tr. ALJ Hearing at 821–22 (Sept. 19, 2011). The ALJ acknowledged that the expert's experience with safety measures necessary for observing wild killer whales from boats might not directly relate to safety measures for close interactions with captive killer whales, but concluded this went to the weight of his testimony, not its admissibility.

"[F]inders of fact are normally accorded wide latitude in determining whether proffered expert testimony would be

helpful." *U.S. Postal Serv.*, 2006 WL 6463045, at \*10. This court has held that the ALJ's "reasonable determination . . . regarding not only the relevance but the reliability of expert testimony" is entitled to deference. *Sec'y of Labor v. Keystone Coal Mining Corp.*, 151 F.3d 1096, 1107 (D.C. Cir. 1998). The Secretary's expert had logged thousands of hours observing the behavior of killer whales in the wild, and based on that expertise he opined that Tilikum's killing of Ms. Brancheau "exemplifies the same behavior I have seen in approximately 100 foraging encounters in the wild with killer whales." Report of D.A. Duffus, Ph.D., at 14 (July 26, 2011). He had also reviewed nearly 100 of SeaWorld's incident reports and concluded they "clearly tell us that trainers are at risk every time they enter the water with whales." *Id.* His experience and knowledge supports the reliability of his testimony, and his observations of killer whale behavior were relevant to the predictability of killer whales and the safety of close contact with them. SeaWorld countered his opinions with its own expert who had worked as a SeaWorld trainer. We find no abuse of discretion by the ALJ, particularly in view of his acknowledgment of the limitation on the weight properly accorded to the Secretary's expert's opinions and the expert's acknowledgments of both the limits of his experience and the evidence showing SeaWorld's operant conditioning often worked to reduce risk.

## C.

Substantial evidence supports the ALJ's findings that it was feasible for SeaWorld to abate the hazard to its employees by using barriers or minimum distance between trainers and killer whales, most notably because SeaWorld has implemented many of these measures on its own. When an employer has existing safety procedures, the burden is on the Secretary to show that those procedures are inadequate. *See Cerro Metal Prods. Div., Marmon Grp., Inc.*, 12 BNA OSHC 1821, 1986 WL 53467, at \*2 (No. 78-5159, 1986) (citing *Nat'l Realty & Constr. Co.*, 489 F.2d

at 1267–68 & n.40). The record evidence showed that SeaWorld's training and protocols did not prevent continued incidents, including the submerging and biting of one trainer in 2006, the killing of a trainer by a SeaWorld-trained and -owned killer whale in 2009 at an amusement park in Spain, and Ms. Brancheau's death in 2010. SeaWorld employees repeatedly acknowledged the unpredictability of its killer whales. This record evidence supports the ALJ's finding that existing protocols were inadequate to eliminate or materially reduce the hazard to SeaWorld's trainer employees performing with killer whales.

Abatement is "feasible" when it is "economically and technologically capable of being done." *Baroid*, 660 F.2d at 447 (citing *Am. Textile Mfrs. Inst., Inc. v. Donovan*, 452 U.S. 490 (1981)). After Ms. Brancheau's death, SeaWorld required that all trainers work with Tilikum from a minimum distance or behind a barrier, and "waterwork" ceased with all of its killer whales. As in *ConAgra, Inc., McMillan Co. Div.*, 11 BNA OSHC 1141, 1983 WL 23849 (No. 79-1146, 1983), implementing the ordered abatement is feasible because it would involve extending these practices to all killer whales and into the future. *See id.* at 1145, *5. As the ALJ noted, SeaWorld had not argued the Secretary's proposed abatement was not economically or technologically feasible and had already implemented abatement for at least one of its killer whales and needed only to apply the same or similar protective contact measures it used with Tilikum to other killer whales. Consequently, the Secretary was not required to specify the precise manner in which abatement should be implemented. That the ALJ subsequently granted SeaWorld's request for a six-month extension of the abatement deadline, in view of SeaWorld's difficulty in scheduling two consulting experts, does not undermine the substantial evidence that SeaWorld could feasibly abate the hazard. SeaWorld does not dispute that the Secretary's

abatement measures would materially reduce, if not eliminate, the hazard killer whales pose to its employees during performances. SeaWorld's use of protective contact with Tilikum, the three-year moratorium on "waterwork" after Ms. Brancheau's death, and repeated temporary cessation of "waterwork" with all killer whales or particular killer whales after other incidents support the finding that these changes were feasible and would not fundamentally alter the nature of the trainers' employment or SeaWorld's business.

To the extent SeaWorld suggests that veterinary care would be less effective and dangers to trainers from killer whales might increase absent close contact during performances, this issue is not properly before the court. SeaWorld's petition to the Commission for review did not include this issue, and SeaWorld presents no extraordinary circumstances to excuse its failure to do so. The court, therefore, lacks jurisdiction to consider it. *See* 29 U.S.C. § 660(a); *Frank Lill & Son, Inc.*, 362 F.3d at 844.

**D.**

Facial challenges to the general duty clause have been rejected, *see Ensign-Bickford Co. v. OSHRC*, 717 F.2d 1419, 1421 (D.C. Cir. 1983), and although an as-applied challenge would be possible, courts have long accommodated possible constitutional problems with fair notice in this context by interpreting "recognized hazard" only to include preventable hazards, *see id.* (citing *Nat'l Realty & Constr. Co.*, 489 F.2d at 1265–66), or applying the clause only "when a reasonably prudent employer in the industry would have known that the proposed method of abatement was required," *Donovan v. Royal Logging Co.*, 645 F.2d 822, 831 (9th Cir. 1981).

SeaWorld contends the general duty clause is unconstitutionally vague as applied because it lacked fair notice that the abatement measures would be required. But the

administrative record establishes that SeaWorld did not lack fair notice because the hazard arising from trainers' close contact with killer whales in performance is preventable. Given evidence of continued incidents of aggressive behavior by killer whales toward trainers notwithstanding SeaWorld's training, operant conditioning practices, and emergency measures, SeaWorld could have anticipated that abatement measures it had applied after other incidents would be required. SeaWorld suggests that it was entitled to rely on the fact that the State of California's Division of Occupational Safety and Health ("Cal/OSHA") did not issue a citation for killer whale hazards after a killer whale bit and dragged a trainer underwater during a performance, puncturing the trainer's skin on both feet and breaking the metatarsal in his left foot. Cal/OSHA, however, inspected a different SeaWorld facility (in San Diego) and it, not the federal OSHA, resolved the citation question. In any event, the State inspection report included a warning on point. Although noting that SeaWorld had been following industry standards and was a recognized leader in training killer whales for performance, and that its employees were well-trained and followed emergency procedures, Cal/OSHA concluded that SeaWorld of San Diego's procedures "were not entirely effective at stopping the unwanted behaviors of the killer whale during this attack" and that "[s]hort of eliminating all of the water interactions with the killer whales, there is no guarantee that employees can be kept safe from an attack by the killer whale once they get in the water with the animal." Cal/OSHA Information Memorandum at 1 (Feb. 28, 2007).

Accordingly, we deny the petition for review.

KAVANAUGH, *Circuit Judge*, dissenting:   Many sports events and entertainment shows can be extremely dangerous for the participants.  Football.  Ice hockey.  Downhill skiing.  Air shows.   The circus.   Horse racing.   Tiger taming.  Standing in the batter's box against a 95 mile per hour fastball.  Bull riding at the rodeo.  Skydiving into the stadium before a football game.  Daredevil motorcycle jumps.  Stock car racing.  Cheerleading vaults.  Boxing.  The balance beam.  The ironman triathlon.  Animal trainer shows.  Movie stunts.  The list goes on.

But the participants in those activities want to take part, sometimes even to make a career of it, despite and occasionally because of the known risk of serious injury.  To be fearless, courageous, tough – to perform a sport or activity at the highest levels of human capacity, even in the face of known physical risk – is among the greatest forms of personal achievement for many who take part in these activities.  American spectators enjoy watching these amazing feats of competition and daring, and they pay a lot to do so.  Americans like to witness the thrill of victory, to cheer the linebacker who hammers the running back at the goal line, to yell with admiration as Derek Jeter flies into the stands down the left-field line to make a catch, to applaud the gymnast who nails the back flip off the balance beam, to hold their collective breath as Jack Hanna plays with pythons, to root on the marathoner who is near collapse at the finish line, to scream "Foreman" when the announcer says "Down goes Frazier."  And American spectators also commiserate during the "agony of defeat," as immortalized in the Wide World of Sports video of a ski jumper flying horribly off course.

The broad question implicated by this case is this:  When should we as a society paternalistically decide that the participants in these sports and entertainment activities must be protected from themselves – that the risk of significant physical injury is simply too great even for eager and willing

participants? And most importantly for this case, *who decides* that the risk to participants is too high?

In the first instance, the sports and entertainment industries regulate themselves, often through collaboration between management and participants, to ensure that the risks are at least known to all. Often, the sports and entertainment industries take affirmative steps to make the sports or activities safer for participants. Major League Baseball has required batters to wear increasingly protective helmets; just this offseason, it issued a new rule about home-plate collisions. The NFL has prohibited certain hits to the head. NASCAR has mandated roll cages, fire retardant uniforms, and window netting. And so on.

Sometimes Congress, state legislatures, or state regulators jump into the fray by prohibiting or otherwise regulating certain sports or entertainment activities. *See, e.g.*, Professional Boxing Safety Act of 1996, Pub. L. No. 104-272, 110 Stat. 3309. State tort law also looms as a significant constraint in most jurisdictions, particularly for allegedly known but unwarned-of risks to the participants, as the NFL has recently experienced. *See In re National Football League Players' Concussion Injury Litigation*, MDL No. 2323, 2014 WL 114351 (E.D. Pa. Jan. 14, 2014).

On the other hand, the bureaucracy at the U.S. Department of Labor has not traditionally been thought of as the proper body to decide whether to ban fighting in hockey, to prohibit the punt return in football, to regulate the distance between the mound and home plate in baseball, to separate the lions from the tamers at the circus, or the like.

To be sure, the Occupational Safety and Health Act of 1970 grants general authority to the Department of Labor to ensure that employers provide a reasonably safe workplace to

their employees. *See* Pub. L. No. 91-596, 84 Stat. 1590. Under the Act, the Department may promulgate specific occupational safety and health standards "reasonably necessary or appropriate to provide safe or healthful employment and places of employment." 29 U.S.C. § 652(8); *see id.* § 655(b). The Act's residual General Duty Clause also requires that each employer – under threat of monetary penalties in individual cases – "furnish to each of his employees employment and a place of employment which are free from recognized hazards that are causing or are likely to cause death or serious physical harm to his employees." *Id.* § 654(a)(1); *see id.* § 666.

But the Department of Labor, acting with a fair degree of prudence and wisdom, has not traditionally tried to stretch its general authority under the Act to regulate participants taking part in the normal activities of sports events or entertainment shows.

In this case, however, the Department departed from tradition and stormed headlong into a new regulatory arena. The Department issued a citation to SeaWorld that effectively bans SeaWorld from continuing a longstanding and popular (albeit by definition somewhat dangerous) show in which SeaWorld trainers play with and interact with whales. The Department's SeaWorld decision was upheld administratively by the independent Occupational Safety and Health Review Commission,[1] and the majority opinion today affirms.

---

[1] The Occupational Safety and Health Review Commission is an independent adjudicatory agency "established to settle disputes between employers and the Secretary of Labor over citations issued by the Secretary's inspectors." *Oil, Chemical & Atomic Workers International Union v. Occupational Safety & Health Review Commission*, 671 F.2d 643, 652 (D.C. Cir. 1982). We are

4

Whether SeaWorld's show is unreasonably dangerous to participants and should be banned or changed is not the question before us. The question before us is whether the Department of Labor has authority under current law to make that decision – in addition to the authority already possessed by Congress, state legislatures, state regulators, and courts applying state tort law.

In my view, the Department of Labor's unprecedented assertion of authority to proscribe SeaWorld's whale show is triply flawed: First, it departs from longstanding administrative precedent governing the extent of the Department's authority. Second, it irrationally and arbitrarily distinguishes (i) close contact between trainers and whales in SeaWorld shows from (ii) contact between players in the NFL or speeding in NASCAR races, for example, which the Department still proclaims as exempt from regulation under this statute. Third, the decision green-lights the Department to regulate sports and entertainment activities in a way that Congress could not conceivably have intended in 1970 when giving the agency general authority to ensure safer workplaces.[2]

---

technically reviewing the decision of the Commission, which in turn reviewed and upheld the Department of Labor's citation. In this case, to the extent the Department's decision to cite SeaWorld was arbitrary and capricious, the Commission's decision to uphold that citation likewise would be arbitrary and capricious. Therefore, for ease of reference, this opinion refers to the action of the Department of Labor, the real party in interest.

[2] This case concerns injuries to participants, not to spectators. The Department of Labor has not claimed authority under the Occupational Safety and Health Act to prevent injuries to spectators, such as injuries caused by foul balls or flying hockey pucks. The spectators are not employees of the teams or industries

5

*First*, the Department of Labor's action departs without acknowledgment or explanation from longstanding administrative precedent. It is therefore arbitrary and capricious and cannot stand. *See FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009) ("An agency may not, for example, depart from a prior policy *sub silentio* or simply disregard rules that are still on the books.").

The courts and the Department of Labor have recognized that the broad terms of the General Duty Clause must be applied reasonably lest the Clause morph into a blunt instrument by which absolute workers'-compensation-like liability is imposed on employers for all workplace injuries. The courts and the Department have stated that it must have been "feasible" for the employer to eliminate or materially reduce the recognized hazard at issue. *See, e.g.*, *Fabi Construction Co., Inc. v. Secretary of Labor*, 508 F.3d 1077, 1081 (D.C. Cir. 2007); *National Realty & Construction Co., Inc. v. Occupational Safety & Health Review Commission*, 489 F.2d 1257, 1266-67 & n.37 (D.C. Cir. 1973). And importantly, the Department has acknowledged that hazards posed by the normal activities intrinsic to an industry cannot be "feasibly" eliminated and so may not form the basis of a General Duty Clause citation.

In the leading *Pelron* case, the Department of Labor had issued a General Duty Clause citation to Pelron Corporation, a manufacturer of liquid specialty chemicals, following a chemical explosion at one of Pelron's manufacturing facilities. *See Pelron Corp.*, 12 BNA OSHC 1833, 1986 WL 53616, at *1 (No. 82-388, 1986). The Department alleged that the mere "accumulation" in Pelron's facility of a

---

and so are not within the scope of the Act. Injuries to spectators are often addressed by state tort law.

potentially dangerous chemical constituted a recognized hazard that Pelron had failed to eliminate. *Id.* at \*4. But the Occupational Safety and Health Review Commission vacated the Department's citation. *See id*. at \*1. In explaining why the mere presence of a dangerous chemical could not constitute a recognized hazard, the Commission stated: "Obviously, some industrial activities are by their very nature dangerous. To permit the normal activities in such an industry to be defined as a 'recognized hazard' within the meaning" of the General Duty Clause is "to eliminate an element of the Secretary's burden of proof and, in fact, almost to prove the Secretary's case by definition, since under such a formula the employer can *never* free the workplace of inherent risks incident to the business." *Id.* at \*3.

*Pelron* means that some activities, though dangerous, are among the "normal activities" intrinsic to the industry and therefore cannot be proscribed or penalized under the General Duty Clause. At oral argument, counsel for the Department of Labor confirmed that *Pelron* remains good law, and so the Department must adhere to *Pelron*. *See* Oral Arg. at 17:02-17:05.

*Pelron* is dispositive in this case. In the sports and entertainment fields, the activity itself frequently carries some risk that cannot be eliminated without fundamentally altering the nature of the activity as defined within the industry. Tackling is part of football, speeding is part of stock car racing, playing with dangerous animals is part of zoo and animal shows, and punching is part of boxing, as those industries define themselves.

Management and participants in the relevant sports or entertainment industry must initially decide what their competition or show consists of and how to market it to

spectators – subject to appropriate regulation by Congress, state legislatures, state regulators, or state tort law. Here, SeaWorld has decided that close contact between SeaWorld trainers and whales is an important aspect of its shows. Even the administrative law judge who upheld the Department's citation in this case agreed that "SeaWorld's business model was premised on the spectacle of close contact between the killer whales and the trainers during performances." *SeaWorld of Florida, LLC*, 2013 CCH OSHD ¶ 33,329, 2013 WL 5505276, at *5 (No. 12-1697, 2013) (ALJ).

Under the current statutory scheme, *Pelron* precludes the Department of Labor from entering the arena and altering the activities of the participants in those competitions or shows, whether it be the NFL or NASCAR or SeaWorld. The Department of Labor can no more tell the participants in a sports event or entertainment show that their activities are simply too dangerous to perform than it could tell the Pelron Corporation that its chemicals were simply too dangerous to produce.

In short, under *Pelron*, the Department of Labor lacks authority to regulate the normal activities of participants in sports events or entertainment shows. Indeed, until its action against SeaWorld, the Department of Labor had never before asserted authority to regulate the normal activities of participants in sports events or entertainment shows.[3] If

---

[3] The *Pelron* principle covers injuries to the participants taking part in the relevant sport or show. To be clear, consistent with *Pelron*, the Department of Labor of course may regulate the workplace conditions that are not the "normal activities" of the participants during the competition or show – for example, the workplace conditions for the workers who cook the hot dogs or sell the beer or build the stage or erect the goalposts, or the off-stage conditions for the event's participants. With the exception of the

*Pelron* remains good law – and the Department itself acknowledges that it does – then the Department's unprecedented attempt here to ban close contact between trainers and whales at SeaWorld cannot stand.[4]

---

Spider-Man show, all of the examples listed in footnote 1 of the majority opinion are outside the scope of the *Pelron* rule and not responsive to this dissent. Moreover, even the Department's action with respect to the Spider-Man show came after its action against SeaWorld in this case. The Department's action against SeaWorld was its initial, entirely unprecedented effort to regulate the normal activities of sports events and entertainment shows.

[4] The majority opinion says that applying *Pelron* here would prevent the Department of Labor from regulating construction or logging or roofing, among other things. That is incorrect and just highlights, in my view, that the majority opinion is not fully appreciating or correctly analyzing the critical and novel issue presented in this case. The Department of Labor obviously has authority over those kinds of workplaces. As explained in *Pelron*, the Department may not completely forbid an industry from offering its product – in the examples cited by the majority opinion, the product might be a building, timber, or a roof – but the Department of course may and frequently does attempt to reduce the risk in the workplaces where the production of those products occurs. In this case, a distinct issue arises because sports and entertainment are industries where the product being offered is a spectator event structured and marketed in a way that often includes some risk for the participants, whether it is a punt return in football or a whale show at SeaWorld. Put another way, in sports events and entertainment shows, there is no distinction between the product being offered and its production; the product *is* the production. That's what makes sports events and entertainment shows analytically different from construction or logging or roofing for purposes of the *Pelron* principle. And that's no doubt why the Department of Labor until recently has not seen fit to regulate the sports and entertainment industries in this way.

*Second*, a "fundamental norm of administrative procedure requires an agency to treat like cases alike." *Westar Energy, Inc. v. Federal Energy Regulatory Commission*, 473 F.3d 1239, 1241 (D.C. Cir. 2007). Here, the Department has failed that basic test, and its action is therefore arbitrary and capricious.

To allay concerns about the breadth of its assertion of regulatory authority in this case, the Department – consistent with its traditional practice – has repeatedly disclaimed authority under the General Duty Clause to ban, for example, tackling in the NFL or excessive speed in NASCAR races. *See* Br. for Secretary of Labor 52; Oral Arg. at 19:15-19:29, 33:05-33:25. As the Department no doubt realizes, the *Pelron* principle bars it from asserting such broad regulatory authority. The Department surely understands that it would find itself on shaky legal ground – not to mention face popular and congressional backlash – if it asserted such authority.

Yet the line the Department has drawn in applying the *Pelron* principle is entirely arbitrary and unreasonable. The Department cannot reasonably distinguish close contact with whales at SeaWorld from tackling in the NFL or speeding in NASCAR. The Department's sole justification for the distinction is that SeaWorld *could* modify (and indeed, since the Department's decision, has had to modify) its shows to eliminate close contact with whales without going out of business. But so too, the NFL *could* ban tackling or punt returns or blocks below the waist. And likewise, NASCAR *could* impose a speed limit during its races. But the Department has not claimed that it can regulate those activities. So that is not a reasonable way to distinguish sports from SeaWorld. The Department assures us, however, that it would never dictate such outcomes in those sports

because "physical contact between players is intrinsic to professional football, as is high speed driving to professional auto racing." Br. for Secretary of Labor 52. But that ipse dixit just brings us back to square one: Why isn't close contact between trainers and whales as intrinsic to SeaWorld's aquatic entertainment enterprise as tackling is to football or speeding is to auto racing? The Department offers no answer at all.[5]

In my view, the Department of Labor either has authority to regulate sports and entertainment so as to prevent injuries to participants, or it does not. The fact that the Department expressly disclaims its authority over the NFL and NASCAR, and that the Department goes to such lengths to draw head-scratching distinctions between sports events on the one hand and entertainment shows on the other, shows that something is up. What's up is that the Department is treating similar cases dissimilarly, the paradigmatic arbitrary and capricious agency action. *See Muwekma Ohlone Tribe v. Salazar*, 708 F.3d 209, 215-16 (D.C. Cir. 2013); *County of Los Angeles v. Shalala*, 192 F.3d 1005, 1022 (D.C. Cir. 1999); *Transactive Corp. v. United States*, 91 F.3d 232, 237 (D.C. Cir. 1996) ("A long line of precedent has established that an agency action is arbitrary when the agency offered insufficient reasons for treating similar situations differently.").

---

[5] The majority opinion does not try to defend the Department's effort to distinguish SeaWorld from, for example, the NFL or NASCAR. Rather, the majority opinion says that SeaWorld's argument that the Department was arbitrarily distinguishing SeaWorld from the NFL or NASCAR was not raised before the Commission and has been forfeited. But in responding in this Court to that argument by SeaWorld, the Department of Labor has not asserted forfeiture. So the Department itself forfeited any potential forfeiture argument.

Because the Department of Labor's decision rests on illusory and arbitrary distinctions and rationales, it cannot stand.

*Third*, even though the Department disclaims authority to, for example, ban punt returns in the NFL or speeding in NASCAR, the Department's action here still interferes with the sports and entertainment industry to a degree that Congress surely did not intend when it passed the Occupational Safety and Health Act.

The Congress that enacted the Act in 1970 was certainly aware of the hazards in many popular sports such as football, baseball, ice hockey, and boxing. It was also well aware of the hazards in entertainment shows such as the circus. Yet as SeaWorld correctly points out, Congress did not in any way indicate or even hint that the Clause's vague terms encompassed an implicit grant of authority to the Department of Labor to regulate and re-make some undefined swath of America's sports and entertainment behemoth.

In the real world, it is simply not plausible to assert that Congress, when passing the Occupational Safety and Health Act, silently intended to authorize the Department of Labor to eliminate familiar sports and entertainment practices, such as punt returns in the NFL, speeding in NASCAR, or the whale show at SeaWorld. *See FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 160 (2000) ("[W]e are confident that Congress could not have intended to delegate a decision of such economic and political significance to an agency in so cryptic a fashion.").

\* \* \*

To the extent sports or entertainment activities raise concern about the risk of injury to the participants, several

extant legal bodies possess significant authority to clamp down on unreasonable dangers: Congress, state legislatures, state regulators, courts applying state tort law. I take no position here on whether SeaWorld – or for that matter the NFL or NASCAR – should be subject to more stringent government regulation or liability, or otherwise should voluntarily make its activities safer. That *policy* question is not before us. My *legal* disagreement with the majority opinion boils down to one basic question: Who decides? Under current law, it is not the Department of Labor. I respectfully dissent.